## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| In re Viatris Inc. Securities Litigation | Master File No. 2:23-cv-00812 |
| | **CONSOLIDATED AMENDED COMPLAINT** |
| | Complaint-Class Action |
| | Jury Trial Demanded |
| | Hon. Marilyn J. Horan |

# TABLE OF CONTENTS

Glossary of Terms .................................................................................................................. iii

Introduction ............................................................................................................................ 1

Jurisdiction and Venue .......................................................................................................... 6

Parties ..................................................................................................................................... 7

Factual Background ................................................................................................................ 8

I.   After years of stagnant growth, Mylan seeks reinvention by merging with Upjohn ...... 8

   A.   Struggling in the increasingly competitive generic drugs market, Mylan seizes on biosimilars as bright spot for growth ........................................................................ 8

   B.   With its problems continuing to mount, Mylan launches "strategic review" in desperate attempt to find an alternative to "unlock" its value ............................. 13

   C.   Completing strategic review, Mylan announces that it will merge with Upjohn to create Viatris, a "new kind of global healthcare company" ................................. 16

   D.   After Viatris disappoints with financial guidance for 2021, Defendants insist that 2021 will be the Company's "trough year" ...................................................... 17

II.   In inaugural Investor Day, Defendants unveil Viatris's "unique and differentiated business model" and emphasize its commitment to biosimilars ........................................ 20

III.   Throughout the rest of 2021, Defendants consistently touted Viatris's business model and its commitment to biosimilars ................................................................................... 32

   A.   Defendants declare strong first quarter results "validate" Viatris's business model and define midpoint of 2021 earnings guidance to be the "true floor of our business" ............. 33

   B.   Viatris reports continued biosimilars growth in the second quarter, highlighting "historic approval" of first interchangeable biosimilar in the United States ......................... 37

   C.   With strategic planning process finished, Defendants continue to confirm that $6.2 billion in EBITDA is the "true floor" and that biosimilars remains catalyst for growth ....... 40

IV.   Viatris stuns market by unveiling "global reshaping initiative" to "reshape the entire company," starting with sale of entire biosimilars business .................................................................. 44

Exchange Act Violations ...................................................................................................... 59

I.   Materially False and Misleading Statements and Omissions .......................................... 59

   A.   March 2021 Investor Day ......................................................................................... 59

   B.   Barclays Global Healthcare Conference .................................................................. 65

   C.   First Quarter Earnings Call ....................................................................................... 69

   D.   RBC Capital Markets Healthcare Conference .......................................................... 72

   E.   Goldman Sachs Global Healthcare Conference ....................................................... 76

   F.   Second Quarter Press Release and Earnings Call .................................................... 81

   G.   Citigroup BioPharma Conference ............................................................................ 89

H.  Third Quarter Earnings Call ..................................................................................... 94

I.  Evercore ISI HealthCONx Conference ...................................................................... 98

II.  Summary of allegations that Defendants knowingly or recklessly misled investors ................. 103

III.  Loss Causation and Economic Loss .......................................................................... 108

IV.  Presumption of Reliance .......................................................................................... 110

V.  Class Action Allegations .......................................................................................... 111

VI.  Inapplicability of the Statutory Safe Harbor and Bespeaks-Caution Doctrine ..................... 112

VII. Causes of Action ..................................................................................................... 113

Count I: Violation of Section 10(b) of the Exchange Act ............................................... 113

Count II: Violation of Section 20(a) of the Exchange Act .............................................. 115

Prayer for Relief ............................................................................................................. 117

Jury Trial Demand .......................................................................................................... 117

# GLOSSARY OF TERMS

| Term | Definition |
| --- | --- |
| 505(b)(2) | A streamlined NDA (defined below) process in which the applicant relies upon one or more investigations conducted by someone other than the applicant and for which the applicant has not obtained right of reference. |
| Adjusted EBITDA | A non-GAAP financial measure that is a type of EBITDA (defined below) that, in the case of Viatris, is further adjusted for share-based compensation expense, litigation settlements, and other contingencies, net, restructuring and other special items |
| Amneal | Amneal Pharmaceuticals |
| API | Active pharmaceutical ingredient |
| Biocon | Biocon Limited, an Indian biopharmaceutical company. |
| Biocon Biologics | Biocon Biologics Limited, a majority owned subsidiary of Biocon |
| Biocon Biologics Transaction | The transaction between Viatris and Biocon Biologics pursuant to which Viatris contributed its biosimilars portfolio, composed of the Biocon collaboration programs, biosimilars to Humira®, Enbrel®, and Eylea®, as well as related assets and liabilities to Biocon Biologics |
| Biocon Agreement | The transaction agreement between Viatris and Biocon Biologics, dated February 27, 2022, relating to the Biocon Biologics Transaction, as amended by that certain Amendment No. 1 to Transaction Agreement, dated November 28, 2022 |
| Biocon Confidentiality Agreement | The Confidentiality Agreement between Viatris and Biocon Biologics, dated October 26, 2021, relating to the Biocon Biologics Transaction. |
| Biologics | Refers to a wide range of biologic products such as vaccines, blood and blood components, allergenics, somatic cells, gene therapy, tissues, and genetically engineered proteins. |
| Biosimilar | A biologic product that is approved by regulatory authorities as highly similar to the originally approved brand version with no clinically meaningful differences in safety or efficacy. |
| BLA | Biologics License Application, the FDA's standard mechanism for approval of biologic products. |
| Brand drugs | Typically prescription pharmaceuticals that are sufficiently novel as to be protected by patents or other forms of exclusivity, often bearing trade names. |
| Class Period | The period from March 1, 2021 to February 25, 2022, inclusive. |
| Complex generic drugs | Generic drugs (defined below) that could have a complex active ingredient, complex formulation, complex route of delivery or complex drug device combinations. |

| | |
|---|---|
| Developed Markets segment | Viatris' commercial segment that includes its operations primarily in the following markets: North America and Europe |
| EBITDA | A non-GAAP financial measure often used to track and compare the underlying profitability of companies, which is computed by taking a company's net earnings (loss) adjusted for net contribution attributable to equity method investments, income tax provision (benefit), interest expense and depreciation and amortization |
| Emerging Markets segment | Viatris' commercial segment that includes, but is not limited to, its operations primarily in the following markets: Parts of Asia, the Middle East, South and Central America, Africa, and Eastern Europe |
| Endo | Endo International Plc |
| Exchange Act | Securities Exchange Act of 1934, as amended |
| FDA | U.S. Food and Drug Administration |
| Generic drugs | Therapeutically equivalent versions of brand drugs that become available once the patents and other exclusivities on their branded counterparts expire. |
| Greater China segment | Viatris' commercial segment that includes its operations primarily in the following markets: China, Taiwan and Hong Kong |
| Interchangeable biosimilar | A biosimilar (defined above) that may be substituted at the pharmacy for the reference product without the intervention of the prescribing health care provider, much like how generic drugs are routinely substituted for brand-name drugs |
| JANZ segment | Viatris' commercial segment that includes its operations in the following markets: Japan, Australia and New Zealand |
| LOE | Loss of exclusivity |
| Momenta | Momenta Pharmaceuticals, Inc. |
| Mylan | Mylan N.V. and its subsidiaries |
| Mylan-Upjohn Combination | Refers to Mylan's combination with Pfizer's Upjohn business in a Reverse Morris Trust transaction to form Viatris on November 16, 2020 |
| NCEs | New Chemical Entities |
| NDA | New drug application, the vehicle in the United States through which drug sponsors formally propose that the FDA approve a new pharmaceutical for sale and marketing. |
| Ogivri | A biosimilar to Herceptin®, a treatment of a form of breast cancer and metastatic stomach cancer |
| OTC | Over-the-counter |
| Perrigo | Perrigo Co. Plc |

| | |
|---|---|
| Pfizer | Pfizer Inc. |
| R&D | Research and development |
| SEC | U.S. Securities and Exchange Commission |
| Semglee | A biosimilar for Lantus® (insulin glargine), a diabetes drug. |
| Teva | Teva Pharmaceuticals |
| Upjohn | Upjohn Inc., a wholly owned subsidiary of Pfizer prior to the Distribution, that combined with Mylan and was renamed Viatris Inc. |
| Upjohn Business | Pfizer's off-patent branded and generic established medicines business that, in connection with the Combination, was separated from Pfizer and combined with Mylan to form Viatris |
| Viatris | Viatris Inc., formerly known as Upjohn Inc. prior to the completion of the Combination |

Plaintiff Eastern Atlantic States Carpenters Pension, Annuity and Health Funds, by and through counsel, bring claims under the Securities Exchange Act of 1934, individually and on behalf of all persons who purchased or otherwise acquired Viatris Inc. common stock between March 1, 2021 and February 25, 2022, inclusive ("Class Period"), and were damaged as a result. Plaintiff brings these claims against Viatris Inc., as well as two Viatris executives serving during the Class Period, its Chief Executive Officer Michael Goettler and its President Rajiv Malik, who both also served as Directors of Viatris. Plaintiff alleges that throughout the Class Period, Defendants made a series of materially false or misleading statements and omissions that they knew or recklessly disregarded were false or misleading at the time the statements were made.

Except as to allegations pertaining specifically to Plaintiff, all allegations are based upon the investigation undertaken by Lead Counsel, which included, but was not limited to, review and analysis of: (1) public filings by Viatris with the SEC; (2) press releases and other public statements issued by Defendants; (3) research reports by securities and financial analysts; (4) media and news reports, as well as other publicly available information, concerning Viatris and Defendants; (5) transcripts of Viatris's earnings and other calls and conferences with investors and analysts; and (6) economic analyses. Lead Counsel's investigation into the factual allegations continues and many of the relevant facts are known only to Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery, including access to documents exclusively within Defendants' custody or control, as well as other documents or materials provided to or prepared by state and federal regulators or other third parties.

## INTRODUCTION

1.    This case is about a bait and switch. In November 2020, Defendants announced the creation of Viatris, a "new kind of healthcare company" formed from the combination of Mylan, one of the

world's largest generic drug makers, and Upjohn, Pfizer's off-patent brands division—two businesses that had both seen better days.

2.    For years, Mylan had struggled amid an increasingly competitive generic drugs market in the United States, which had led to rapidly eroding prices for generic drugs. Mylan sought to stem its bleeding revenue by engaging in an aggressive acquisition-based strategy, acquiring new products that it could market and sell to offset the price erosion afflicting much of the rest of its business. Mylan's also had one bright spot, its biosimilars business, which had leveraged partnerships with developers of biosimilars, a newly emerging pharmaceutical product that many industry leaders and analysts viewed as poised for massive growth. But biosimilars were still a fraction of Mylan's business and its acquisitions were not enough to compensate for its heavy losses in generics and its revenue stagnated.

3.    But Mylan had other problems as well. Led at the time by Defendant Malik, who served as the company's second-ranking executive, Mylan had built a track record of scandal, poor transparency, and missing its own financial targets. In 2016, Mylan was at the center of criticism over its pricing of its EpiPen, a life-saving device for allergies. At the same time, Mylan and Malik were also implicated in sweeping investigations by state and federal prosecutors into price collusion in the generic drugs market.

4.    By August 2018, Mylan's problems had reached a breaking point, with some analysts con-cluding that the company's business model was irreparably "broken." Acknowledging the seriousness of its problems, Mylan's board of directors formed a "strategic review committee" that would evaluate alternative options—any options—that might "unlock" the company's value.

5.    One year later, in July 2019, Mylan announced that its strategic review committee had iden-tified a solution: a merger with Upjohn. By that time, Upjohn had been reorganized by Pfizer as a separate division for its off-patent medicines and generics, repackaging Pfizer's older products like Lipitor and Viagra whose patents had expired with its generics business. While sales of those drugs

had plummeted in the United States, Pfizer hoped Upjohn could capitalize on the market for so-called branded generics in emerging markets like China, where low-quality (and even fraudulent) generic drugs were abundant, and even moved Upjohn's headquarters to Shanghai. But Upjohn was generally seen as a drag on Pfizer's overall earnings growth as Pfizer pursued its strategy focused on new and innovative drugs. Indeed, the creation of Upjohn as a standalone division was seen by many industry analysts as a prelude to Pfizer spinning the division off.

6.    Mylan's combination with Upjohn was seen as a deal that solved short-term problems for both companies. Mylan gained Upjohn's cash flow that could offset its eroding prices and debt problems and Pfizer offloaded a division that was diluting its growth prospects in brand-name drugs. But while the deal solved these short-term challenges, many industry analysts were skeptical that the deal could solve Mylan's problems with its business model.

7.    To reassure analysts and investors, Defendants needed a way to convince them that the new company formed from the combination, later called Viatris, was more than just the sum of its two troubled parts. Calling Viatris a "new kind of healthcare company," Defendants said that the Company that would leverage "two highly complementary businesses" to support a "unique and differentiated business model." Unlike other pharmaceutical companies, Viatris had a "broad and diversified portfolio" of products that spanned "all categories" of drugs, from brand, to generics, to complex generics, and most importantly, to biosimilars. That broad and diversified portfolio, Defendants said, was also "agnostic to any therapeutic area," enabling Viatris to "absorb headwinds in any particular part of the world, while seizing on opportunities when and where they present themselves." And while much of Viatris's broad portfolio suffered from inherent price erosion, Defendants said that erosion would be more than offset by its pipeline of biosimilars, which would be a key growth driver and "core part" of the Company's long-term portfolio.

8.    Viatris initially appeared to stumble out of the starting gate, issuing 2021 financial guidance that projected revenue and earnings well below initial forecasts, causing its stock price to plummet. But Viatris's stock price recovered as Defendants assured investors that 2021 would be the Company's "trough year" and "true floor of the business," guaranteeing that Viatris had only way to from there: upward.

9.    And in the months that followed, Viatris appeared to be on track for that upward trajectory, reporting strong results in the first three quarters of 2021, which was driven in part by growth in biosimilars. Defendants capitalized on these early successes, telling investors that the consecutive quarters of strong results "validated" Viatris's business model that differentiated the Company from its investors, proved that its biosimilars pipeline would be a "driver of growth for us going forward," and made it even more certain that 2021 would be Viatris's "floor."

10.    Defendants never wavered from this unequivocal confidence in Viatris's business model and commitment to biosimilars. Month after month, Defendants consistently reiterated the same narrative that Viatris' broad and diversified portfolio and biosimilars growth engine would stabilize the Company in the near-term and drive durable growth in the long-term. Even when analysts noted that some of Viatris's competitors were exiting the biosimilars market after finding it less rosy than they had hoped, Defendants were unmoved, responding: "we have no intention to get out of biosimilars, quite the opposite."

11.    In truth, Defendants were never committed the business model that they had been touting for nearly a year. Nor were they dedicated to biosimilars, or any other part of the business, as a growth driver. To the contrary, at the same time Defendants were touting Viatris's business model as "essentially complete," they were secretly conducting an extensive "strategic review" of the entire business to figure out what their business model should be. Essentially starting from scratch, Defendants reviewed each part of the business to determine whether it was "core" (and should be kept) or

"noncore" (and should be sold). So while Defendants publicly boasted about Viatris's "broad and diversified portfolio," they were privately deciding how much of the business it could sell for parts.

12.    First among the "noncore" assets designated for sale was biosimilars, which Defendants continued to publicly trumpet as a "core part" of Viatris's long-term growth strategy. But well before the end of 2021, Defendants had not only decided to sell Viatris's entire biosimilars business, they were in the final phases of negotiations to sell the business to Biocon Biologics. Even though Defendants knew that selling Viatris's biosimilars business would eliminate the Company's best-known growth driver and erase hundreds of millions of dollars of expected future revenue, Defendants kept their intentions secret and continued to tell investors that biosimilars would continue to be a "driver of growth for us going forward."

13.    In late February 2022, Defendants finally revealed that the business model they had been touting for nearly a year was a sham—a Potemkin business model that Defendants used to buy them time while they figured out the actual one. Announcing a "global reshaping initiative," Defendants said they would "reshape the entire company," starting with the sale of its biosimilars business to Biocon Biologics. Defendants explained that they would soon sell billions of dollars' worth of other "noncore" assets as well. These massive divestitures, Defendants said, would pay down Viatris's debt and facilitate the Company's new focus: branded and innovative drugs in three "targeted therapeutic areas," ophthalmology, gastrointestinal, and dermatology. And while Defendants admitted they had yet to acquire "anchor assets" in these three areas, they insisted that they were the "sweet spot" for the Company.

14.    Analysts and investors were shocked and confused by the news. Defendants' decision to "reshape the entire company" to create a "simpler" and "more focused" company reflected a 180-degree U-turn from nearly everything they had been telling the market for nearly a year. And while many analysts welcomed the strategy shift as a final acknowledgement that Viatris's business model

was broken, they assailed Defendants' secretive approach as exposing a "credibility gap." What is more, by selling Viatris's biosimilars business, Defendants had jettisoned a known growth engine without an obvious or known replacement. It was no surprise, then, that on the news of this fundamental reshaping of Viatris's business, the Company's stock price plummeted by nearly 25% and has not recovered since.

## JURISDICTION AND VENUE

15.    The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

16.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. §78aa. In connection with the acts alleged in this Consolidated Amended Complaint ("Complaint"), Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, without limitation, the U.S. mail, interstate telephone, and other electronic communications, and the facilities of the NASDAQ Stock Market ("Nasdaq"), a national securities exchange.

17.    This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

18.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District. Viatris is headquartered in this District, with its principal place of business located at 1000 Mylan Boulevard, Canonsburg, Pennsylvania, 15317.

## PARTIES

19.     Eastern Atlantic States Carpenters Pension, Annuity and Health Funds ("EASC") is a group of defined benefit pension, annuity, and health funds with assets of over $7.1 billion that provides retirement benefits to about 15,810 participants. As reflected in EASC's certification on file with the Court (ECF No. 21-1), EASC bought shares of Viatris common stock during the Class Period and incurred damages because of the violations of the federal securities laws alleged in this Complaint.

20.     Viatris is a global healthcare corporation, organized under the laws of the State of Delaware. Viatris was formed on November 16, 2020 through a combination of Mylan and Pfizer's Upjohn business. Viatris's common stock trades on Nasdaq under the ticker symbol "VTRS." As of August 2, 2023, Viatris has about 1.2 billion shares of common stock outstanding, owned by hundreds or thousands of investors.

21.     Defendant Michael Goettler was Viatris's Chief Executive and a Director of the Company from its inception in November 2020 until April 2023. Previously, Goettler served as Group President for Pfizer's Upjohn division from July 2018 to November 2020, when Upjohn merged with Mylan to form Viatris. Joining Pfizer in 2009, Goettler held several other roles before becoming Upjohn's Group Resident, including global president of Pfizer Inflammation & Immunology, overseeing a portfolio of inline medicines as well as late-stage, early development and research strategy, and programs spanning rheumatology, dermatology and gastroenterology. During the Class Period, Goettler signed Viatris's Form 10-K with the SEC on March 1, 2021 and Forms 10-Q on May 10, August 9, and November 8, 2021.

22.     Defendant Rajiv Malik has been Viatris's President and a Director of the Company since the Company's inception in November 2020. On October 20, 2023, Viatris announced that Malik will be retiring as an executive of the Company effective April 1, 2024, but that he will continue to serve on the Board of Directors. Previously, Malik served as President of Mylan, where he led the company's

global commercial, scientific, operational as well as information technology and business development activities in more than 165 countries and territories, serving in that role from January 2012 until Mylan's merger with Upjohn. Malik joined Mylan in January 2007 as Head of Global Technical Operations, serving in that role until July 2009. From July 2009 to December 2012, Malik served as Mylan's Executive Vice President and Chief Operating Officer. Before joining Mylan, Malik served as the CEO of Matrix Laboratories from 2005 to 2007, when Mylan acquired Matrix Labs. Prior to 2005, Defendant Malik served in leadership roles at Sandoz, the German pharmaceutical giant, and Ranbaxy, an Indian pharmaceutical company. At Ranbaxy, Defendant Malik began his career in generics research and development and rose through the ranks over a seventeen-year tenure to become the company's Head of Formulation Development and Regulatory Affairs. During the Class Period, Malik signed Viatris's Form 10-K with the SEC on March 1, 2021.

23.    Defendants Goettler and Malik are collectively referred to as the "Individual Defendants," and, together with Viatris, as "Defendants."

## FACTUAL BACKGROUND

### I.    After years of stagnant growth, Mylan seeks reinvention by merging with Upjohn

#### A.    Struggling in the increasingly competitive generic drugs market, Mylan seizes on biosimilars as bright spot for growth

24.    Viatris was formed on November 16, 2020 through a combination of Mylan, one of the largest makers of generic drugs in the world, and Upjohn, the off-patent brand and generics division of Pfizer. Proclaiming itself to be a "new kind of global healthcare company," Viatris's origins are firmly rooted in the troubled history of the two companies that formed it.

25.    In the years before Mylan's merger with Upjohn, Mylan was struggling in the increasingly competitive generic drugs market.

26.    Generic drugs are therapeutically equivalent versions of brand-name drugs and typically become available when the patents on their branded counterparts expire. Generic drugs are cheaper

because the companies that make them can rely on research already done by other brand-name pharmaceutical companies, saving hundreds of millions of dollars in research and development costs. For that reason, the generic drugs market is characterized by lower margins than the brand drugs market.

27.    Over the past decade, those margins have become even slimmer, as generic drug makers face increased competition from new challengers who are able to offer lower and lower prices. As a result, from the moment a new generic drug becomes available when a patent expires, the prices that generic makers can sell the drug for rapidly erode as more and more companies are able to manufacture the drug cheaply. This rapid price erosion has resulted in the generic drug industry losing money on roughly one-third to one-half of the drugs they produce.

28.    By the mid-2010s, many generic drug makers began to struggle to stay afloat in the increasingly challenging market, especially in the United States, with generic drug revenue declined by 50% from 2015 to 2019, mostly due to price erosion. Mylan had been one of the hardest hit companies by generic pricing pressures, with its revenues declining 4% year over year from 2017 to 2018, with revenue from its important North American segment, which accounted for a third of its sales, tumbling even more severely, by 18%.



Source: Reuters.com

29.    For many generic drug companies, these problems became so severe that they left the generics market altogether, shuttering their manufacturing plants or filing for bankruptcy. Other companies and their executives, however, allegedly turned to illegal means to avoid the "fight to the bottom" and maintain their margins with their generic products.

30.    By 2016, federal and state investigators had been engaged in a sweeping investigation of price collusion in the generic drug industry, with Mylan and its second-ranking executive, Defendant Rajiv Malik, among those targeted. In September 2016, the FBI raided Mylan's Pittsburgh headquarters as apart of a multiyear DOJ investigation into Mylan's involvement in what authorities described as widespread price fixing in the generic drug industry. One year later, a lawsuit brought by the attorneys general of 45 states and the District of Columbia accused Mylan and 17 other companies with what prosecutors called a "mind-blowing" scheme to fix generic drug prices, naming two individual executives as defendants, one of whom was Malik.

31.    As Mylan and other leading generic drug makers—such as Perrigo, Endo, Amneal, and Teva— struggled to compete amid rapid price erosion in the generics drug market, their stock prices tumbled, with Mylan's stock losing one-third of its value in the first seven months of 2019 alone.



Source: Reuters.com

32.   While Mylan's generics business struggled, the company had some bright spots. Most nota-

bly, Mylan had positioned itself as strong competitor in the market for biosimilars—a newly emerging

pharmaceutical product that many industry leaders and analysts viewed as poised for massive growth.

33.   Biosimilars are biologic medications—that is, agents derived from living organisms, rather

than chemicals—that are highly similar to existing biologic medicines already licensed by the FDA or

other regulators. Like generics, biosimilars do not have any "clinically meaningful differences" from

their "reference products," often a brand-name drug. But unlike generics, biosimilars are highly com-

plex, requiring significant investment in research and development, and can be used to treat a range

of chronic and severe conditions, from chronic skin and bowel diseases to diabetes to certain cancers.

34.   Because biosimilars require greater investment to develop and to manufacture, biosimilars

are less prone to the rapid price erosion afflicting generic drugs. For that reason, biosimilars can

generate a larger margin and for a longer time than generics. Since the mid-2010s, while the generics market increasingly struggled, the global biosimilars market has experienced "monumental growth," with biosimilar sales topping $15 billion in 2020 and projected to reach $75 billion or more within the next decade.

35.    Mylan emerged as a major competitor in biosimilars with the help of key strategic partners with companies like Biocon and Momenta, which formed the majority of Mylan's biosimilars pipeline. Mylan's "partnership-driven model" leveraged its strategic alliances with multiple biosimilars developers, most notably its exclusive collaborations with Biocon, an Indian biopharmaceutical company with experience and expertise in developing monoclonal antibodies and other biologics for emerging markets. Mylan's partnership with Biocon was mutually beneficial for both companies. Mylan provided the commercialization experience and familiarity with payers, providers, and regulators in developed markets that Biocon lacked. In exchange, Biocon provided manufacturing knowledge and capabilities in a lower-cost market. Through its partnership with Biocon, Mylan exclusively commercialized Biocon biosimilars products in the United States, Canada, Japan, Australia, New Zealand, and Europe.

36.    Mylan's biosimilars portfolio through its Biocon partnership started with Ogivri, launched in 2017, a biosimilar to Herceptin, a treatment of a form of breast cancer and metastatic stomach cancer. Mylan later expanded its portfolio to include Fulphila, a biosimilar to Neulasta®, approved to reduce the duration of febrile neutropenia in patients treated with chemotherapy in certain types of cancer, and Semglee, an insulin glargine biosimilar approved in Europe. By 2018, Mylan had a market-leading and comprehensive biosimilar portfolio, covering 75 percent of the top 20 selling biologics available in 2018, and the largest identified developmental biosimilars pipeline of any company, with 22 biosimilar candidates and several approved products in the United States and Europe.

37.    As one of Mylan's few growth segments, the Company's executives consistently highlighted biosimilars as a critical element to Mylan's business model and strategy. At Mylan's Investor Day event

12

in April 2018, for instance, Malik emphasized the company's commitment to biosimilars and being the "partner of choice" for biosimilars developers. "Mylan's commitment to biosimilars continues," said Malik. "We have one of the most comprehensive biosimilar pipelines and we will continue to prioritize and invest more based on what the market needs."



Source: Mylan 2018 Investor Day Presentation, April 12, 2018.

### B. With its problems continuing to mount, Mylan launches "strategic review" in desperate attempt to find an alternative to "unlock" its value

38.    While Mylan's biosimilars portfolio was successful, it represented a small fraction of the company's business, which otherwise suffered from inherent price erosion. Mylan's strategy for addressing this erosion focused in part on acquisitions, spending billions on acquisitions to provide new products that Mylan could then sell to offset the erosion from the rest of the business. In 2015 and 2016 alone, Mylan spent nearly $13.5 billion on acquisitions, buying Abbot Established Products for $5.3 billion, Renaissance for $950 million, and Meda for $7.2 billion.

39.    Mylan's acquisitions-based strategy led to the company growing a vast product portfolio of hundreds of products, but its acquisitions were not enough to compensate for the erosion in the rest

of its business. By 2017, many analysts had grown skeptical that Mylan's acquisitions strategy and strength in biosimilars would be enough. For instance, in an August 3, 2017 report, Wells Fargo observed that Mylan's revenue growth from its recent acquisitions was expected to slow, commenting that "[i]n our experience, companies facing slowing organic growth often overreach on acquisitions" and "[w]hile we see some areas as very promising and we believe biosimilars remain a major opportunity, we believe in the near-term, risks for underperformance have increased."

40.    By the following year, in August 2018, Mylan had indeed underperformed, announcing that its second quarter financial results missed analysts estimates for both profit and revenue as the company's sales in North America fell by 22 percent. But Mylan followed this disappointment by announcing that its board of directors had formed a "strategic review committee," which was "actively evaluating a wide range of alternatives to unlock the true value of our one-of-a-kind platform." Explaining the decision to launch a strategic review, Mylan said it concluded the markets "continue to underappreciate and undervalue the durability, differentiation and strengths of Mylan's global diversified business, especially when compared to our peers around the globe."

41.    Analyst reaction to the announcement was mixed, with many expressing skepticism that Mylan could identify a solution that could repair the weaknesses in its business model. For instance, Cowen & Company published a report titled, "This Business Model Looks Broken – Avoid," that explained, "[l]ike all generic franchises, there are only so many undifferentiated acquisitions that can be made to cover the constant downward deterioration in the base businesses" and "[a]a certain point the new product cycle needs to materialize, but in this case it hasn't in a material enough way." Cowen noted that despite $13.5 billion in acquisitions in 2015, 2016, and 2017, which added over $2 billion in EBITDA, Mylan's cash flow guidance for 2018 had remained largely flat from previous years. "The bottom-line is that this type of dynamic where expensive acquisitions simply replace erosion should

not be comforting to long-term investors," Cowen concluded, "and likely mask the true dynamics of the underlying business."

42.    Other analysts echoed this sentiment and also found still more reasons for concern. For instance, in a report published on August 15, 2018, Wells Fargo analyst David Maris reported that the previous month, Mylan entered into an agreement to buy the worldwide rights for a commercialized product for about $463 million, but Mylan did not issue a press release disclosing the transaction. Maris assailed Mylan's lack of transparency. "We believe that investors should know more about the details of this deal," Maris wrote, "especially given its size and if it is accretive, it may mean that Mylan's 2018 guidance lowering may be more conservative than anticipated." Maris continued by recounting "the history of Mylan's earnings guidance," explaining that the Company's recent earnings guidance revision should be viewed "in the context of previous earnings guidance and billions of dollars of accretive acquisitions," noting that "Mylan has a history of setting near- and longer-term financial targets and strategic goals that it ends up missing." Maris concluded by writing that "[w]e believe Mylan has a lot going for it – such as a good list of pipeline generic biosimilar programs and a few near-term catalysts, such as the approval of the long-awaited generic Advair," but "our concern" is "that the history of missing longer-term targets and near-term earnings guidance is reflective of either an inability to forecast accurately or a business that makes accurately forecasting difficult."

43.    Covering Maris's report, *Business Insider* published an article titled, "Mylan quietly made an acquisition for almost half a billion dollars in July that it didn't tell investors about right away," writing that "EpiPen-maker Mylan on July 30 struck a $463 million deal for the worldwide rights to a commercial product, but didn't announce the deal to its investors via a press release — as is typically done with sizable transactions." In another article covering the hidden deal titled, "Analyst chastises Mylan—not known for its transparency—for under-the-radar dealmaking," *FiercePharma.com* wrote that this was "not the first time Mylan's been flagged for keeping mum."

C. **Completing strategic review, Mylan announces that it will merge with Upjohn to create Viatris, a "new kind of global healthcare company"**

44.    One year later, in July 2019, Mylan announced that its strategic review committee had completed its work and identified a solution: Mylan would combine with Upjohn, Pfizer's off-patent brands division. Both Pfizer and Mylan touted the deal as a marriage of "two highly complementary businesses," with Pfizer writing in a press release announcing the deal that "Mylan brings a diverse portfolio across many geographies and key therapeutic areas" and "a robust pipeline, high-quality manufacturing and supply chain excellence," whereas "Upjohn brings trusted, iconic brands, such as Lipitor (atorvastatin calcium), Celebrex (celecoxib) and Viagra (sildenafil), and proven commercialization capabilities, including leadership positions in China and other emerging markets." Mark Parrish, Chair of Mylan's Strategic Review Committee, stated that "[t]his compelling combination concludes the work of Mylan's Strategic Review Committee, which after our exhaustive review of available alternatives best positions the company to unlock value for our shareholders."

45.    Industry analysts and observers viewed the Mylan-Upjohn combination as solving short-term problems for both companies. In an article titled, "Mylan's tumble ends with Pfizer rescue," *BioPharmaDive* wrote that the Mylan-Upjohn transaction "addresses problems for both companies," with "Mylan picking up sizable Upjohn cash flow to offset its own sliding sales and ease debt problems" while "Pfizer offloads a division that was diluting its own growth prospects in branded pharmaceuticals." *FiercePharma.com* echoed that assessment, writing: "The deal would allow Pfizer and Mylan to combine two under-pressure businesses into a new giant." Likewise, Wells Fargo wrote in a report that "the potential deal is a recognition of two major things: Pfizer wants out of generics and Mylan is recognizing its need to change," but added that while the "combined company is bigger," "we are not sure it is better."

46.    In a presentation to analysts and investors, Mylan made bold projections about the financial performance of their new company, projecting pro forma 2020 revenue between $19 and $20 billion and adjusted EBITDA between $7.5 and $8.0 billion.



Source: Mylan-Upjohn Presentation, July 29, 2019

### D. After Viatris disappoints with financial guidance for 2021, Defendants insist that 2021 will be the Company's "trough year"

47.    On February 22, 2021, Viatris announced its 2021 financial guidance earlier than expected, projecting revenue between $17.2 and $17.8 billion and adjusted EBITDA between $6.0 and $6.4 billion with a midpoint of $6.2 billion. The 2021 guidance disappointed analysts as its estimates fell well below the ranges in the 2020 pro forma outlook as well as their own internal estimates.

48.    Defendants responded by reassuring investors that 2021 would be the "right starting point" and a "trough year," essentially guaranteeing both near- and long-term growth from that 2021 bottom. "We are confident that our financial guidance for 2021 is the right starting point for Viatris and continue to expect 2021 to be our trough year in terms of revenue, adjusted EBITDA and free cash flow," Goettler said in a press release that day, "reflecting a balanced view of both near-term tailwinds and headwinds, particularly given the delay in closing of the combination between Mylan and Pfizer's Upjohn business."

49.    In a conference call that Viatris held that day to discuss the 2021 financial guidance, Goettler cast the guidance as part of their effort "to maintain our commitment to transparent communication with you," emphasizing "our commitment from the beginning is that we would take into account all the risks and all the opportunities that we can see including any one-time event and any country-specific headwinds." Goettler outlined their "expected structure for transparent disclosures and financial reporting going forward," which would provide results from each of Viatris's four geographic segments and its three main product categories, brands, complex generics and biosimilars, and generics, as well as the "top products" for each of the geographic segment. "We believe that this will provide the details necessary to follow our business and we look forward to continuing this dialogue with you going forward," Goettler said.



Source: Viatris 2021 Financial Guidance Presentation, February 22, 2021

50. Malik then provided additional detail about the guidance, which he said would show "why we are confident that 2021 will be a trough year." Acknowledging that the 2021 guidance forecasted an approximate 4% overall decline in revenue from Viatris's 2020 combined preliminary estimate, which estimated revenue of $18.15 billion and adjusted EBITDA of $6.81 billion, Malik attributed this underperformance to two main factors: (1) one-time costs, including losses of exclusivity of certain drugs for certain markets, and (2) normal base business of erosion of 4%. That base business erosion of about 4% would continue, Malik said, but he assured that this erosion would be "more than offset by an anticipated $690 million in new product revenue," emphasizing the importance of Viatris's biosimilars pipeline: "We are confident about 2021 being the trough year and we expect to be able to offset normalized base business erosion of 3% to 4% by maximizing our anticipated new product launches including biosimilars and complex generics through our enhanced combined global manufacturing and commercial platform."

51.     Analyst reaction to the guidance remained mixed. Some analysts were optimistic that Viatris's strength in biosimilars would offset the Company's other significant challenges. For instance, Barclays wrote in a report that "[w]hile some investors will likely stay unconvinced about the attractiveness of this business," they still viewed Viatris' "broad portfolio of Complex Generics, Biosimilars and Specialty Products as one which allows for reasonable growth and stable cash flow in a blended global business," explaining that they had rated Viatris' stock as Overweight because of its "extensive Biosimilars portfolio and partnership with Biocon which we think gives it an edge," as well as its "truly diversified global segments" and "complex Generics portfolio."

52.     Other analysts were more uncertain. For instance, in a report titled, "2021 Guidance Below Weak Amid Persisting Operating Challenges," JPMorgan wrote that the 2021 guidance made clear "there are challenges that will remain with the company for the longer term and potential uncertainties still to uncover given the lack [of] visibility into the business." Noting that Viatris expects natural base business erosion of 3-4% annually "to be 'entirely offset' by new product revenues (including biosimilars and complex generics," JPMorgan wrote that they "expect this will continue to be a debate in the story." Similarly, in a report titled, "A Missouri stock – AKA a 'Show-Me' story," Truist wrote that "[w]ith the much-anticipated 2021 guide out of the way, we expect the investment community to remain skeptical until VTRS establishes a track record of meeting/beating the expectations that it sets," adding that "we look forward to more details on the segments, including key drivers, at the Investor Day" on March 1, 2021.

## II.   In inaugural Investor Day, Defendants unveil Viatris's "unique and differentiated business model" and emphasize its commitment to biosimilars

53.     On March 1, 2021, the first day of the Class Period, Viatris held its inaugural Investor Day, during which the Individual Defendants and other Viatris executives detailed the Company's business model and strategy. Malik explained that they had two main objectives for the Investor Day: (1) to get analysts "comfortable" that 2021 would be Viatris's "trough year," and (2) to show Viatris's potential

for new launches and revenue that was "offsetting the base erosion" and proactively managing that erosion.

54.    Goettler began with opening remarks by detailing Viatris's two-phased "clear execution roadmap" to leverage the Company's business model to "optimize total shareholder return."



Source: Viatris Investor Day Presentation, March 1, 2021.

55.    Phase I (also called Horizon 1) of this Strategic Roadmap, Goettler explained, would last until 2023 and provide stable revenue as Viatris focused on delevering and rebalancing the business. Goettler reiterated his statement the previous month that "2021 is our trough year" and reported that Viatris had made significant progress to meet its Phase I goals, accelerating "synergy capture of $1 billion from four years to three years" and expecting "that period to generate strong and growing free cash flow."

56.    Phase II (or Horizon 2) of the Strategic Roadmap, Goettler said, would build on what Viatris accomplished in Phase I, with modest but durable revenue growth generated by the Company's portfolio and pipeline of products.

57.    Turning to Viatris's business model, Goettler declared that the Company's "unique operating model" was "built over many years and through many transactions and the last transaction of which is the Upjohn and Mylan combination" and was "***essentially complete now***." That business model, Goettler emphasized, was "very different" from those of other pharmaceutical companies that focus on "a few key brands mostly protected by patents" to sell in select countries "based on the unmet needs or the market conditions," including intellectual property protection. "At Viatris," Goettler declared, "***our business model is the exact opposite of that***," explaining that Viatris differed because of its ability to "tailor our offering to the needs and opportunities" of markets worldwide with its "broad portfolio" and "growing and emerging area" of "biosimilar and complex generics." As a result, Goettler said, Viatris had "***all the pieces in place to fully leverage our operating model and the powerful and opportunistic platform that we have created***."

58.    Throughout the rest of the opening remarks for the Investor Day, Defendants continued to emphasize Viatris's business model that leveraged its broad and diverse portfolio and commitment to biosimilars to drive growth that would offset the inherent price erosion in the Company's base business.

59.    Malik, for instance, began his presentation by touting Viatris's "diverse and resilient commercial platform," with a "global footprint in 165 markets" and "a portfolio of 1,400 molecules across three broad segments," including "the brands, the generics, and our growing offering of complex generics and biosimilars."



Source: Viatris Investor Day Presentation, March 1, 2021.

60.    Malik devoted much of his attention, however, to the biosimilars and complex generics product category, which he noted had received "a lot of attention." Viatris had demonstrated its commitment to biosimilars, Malik said, with extensive investments in R&D, complex science, regulatory strategy, intellectual property, and legal. With those investments, Malik said, Viatris already had the "core competencies to excel" in biosimilars, which "enabled us to see durable long-term revenue streams" from biosimilars "as compared to the core generics." Malik made the importance of biosimilars clear:

"*We see [biosimilars] as a core part of our forward looking Viatris portfolio.*"

61.    Malik then continued to provide more detail about Viatris's biosimilars business, noting that while the "global biosimilar market is still at a very early stage," the segment was expected to vastly outpace global pharmaceutical market growth, sharing a slide showing the biosimilars market was forecasted to grow more than 130% in 7 years to be valued at more than $690 billion by 2017.

23



Source: Viatris Investor Day Presentation, March 1, 2021.

62.   Touting "big notable successes" with biosimilars in the United States and certain other markets, Malik emphasized that Viatris was poised to "further expand our reach and drive the biosimilar uptakes" across geographic markets. That expansion, Malik explained, was informed from Viatris's prior experience, including its mistakes, from which the Company had learned the importance of establishing "a diversified group of R&D partners" and "global commercial presence in biosimilars" to "focus on introducing the right biosimilar to the right market at the right time."



Source: Viatris Investor Day Presentation, March 1, 2021.

63.    Based on that experience, Malik said, Viatris was "*committed*" to its "*focus on biosimilars*" and that Viatris was "well positioned for future development in biosimilars" having 30 launched, pipeline, or target biosimilars for brands with more than $161 billion in global sales. Malik repeatedly reiterated that Viatris will "*continue to remain committed to invest in the biosimilar development programs*," highlighting that the Company was "extremely focused on our efforts to be the first to the market" and "are well positioned for several of our key programs in the future," and is "committed from scientific as well as from the commercial capabilities and know-how to be a long-term leader in this space."



Source: Viatris Investor Day Presentation, March 1, 2021.

64.   Malik continued by underscoring the importance of biosimilars to Viatris's pipeline, noting that 75% of the Company's pipeline value of $224 billion was composed of complex generics and biosimilars



65.    Other Viatris executives echoed Goettler's and Malik's confidence in Viatris's business model and its commitment to biosimilars. For instance, Anthony Mauro, Viatris's President of Developed Markets, explained how the breadth of Viatris's portfolio and its focus on biosimilars were among the main "building blocks" to "drive growth" in the important Developed Markets segment, which consists of 35 countries in North America and Europe that was projected to account for $10.5 billion in total revenue (or about 60% of the Company's revenue in 2021).



Source: Viatris Investor Day Presentation, March 1, 2021.

66.    Mauro explained that the second of their three building blocks for driving growth in Developed Markets was "focused growth" by concentrating on highly profitable, highly complex products like biosimilars and complex generics, highlighting that two-thirds of product launches expected in the coming years would be either complex generics or biosimilars. This focus on biosimilars was important, Mauro explained, because Viatris expected "historical low to mid-single-digit erosion" to continue, which would be offset by new product launches from biosimilars and complex generics. Mauro

emphasized: "*The continued commitment to our biosimilar franchise across the regions, will be extraordinarily critical to our success.*"

67.    Similarly, Walt Owens, Viatris's Head of Global Research & Development, likewise underscored the critical importance of biosimilars, declaring that "*biosimilars with an emphasis on first to market*" was the second of "*six fundamental pillars that will support the Viatris business.*"



Source: Viatris Investor Day Presentation, March 1, 2021.

68.    Owens stressed that Viatris had a "proven scientific and regulatory track record in biosimilars" that "demonstrated we have internally developed a strong scientific, clinical and regulatory discipline for biosimilars." That proven track record in biosimilars, Owens said, "yielded 313 country level approvals across seven products and has facilitated our ability to market these critical medicines in 76 countries."



Source: Viatris Investor Day Presentation, March 1, 2021.

69.    But Viatris's "focus on biosimilars does not stop with our current pipeline programs," Owens said, explaining that "[m]oving forward we have identified 13 new target development programs, spanning additional therapeutic areas and equating to $57 billion in global grant sales." Combining those development programs with Viatris's "existing portfolio with these new biosimilar targets," Owens said, would "give Viatris one of the industry's leading biosimilar pipelines with 30 products yielding a global brand value of nearly $161 billion," with "75% of the brand product value of our pipeline is associated with a development of complex products and biosimilar." Owens concluded: "*This forward-looking focus on biosimilars in combination with our deep science and track record positions us very well for execution in this critical strategy elemen*t."



Source: Viatris Investor Day Presentation, March 1, 2021.

70.    Malik then concluded the opening remarks by emphasizing that "[o]ur disciplined approach to understanding our profit growth potential on a granular level and strategically managing our resource allocation, coupled with a rigorous performance management process focused on execution and results, gives us the tremendous confidence in our ability to meet our stated objectives." Citing the "diversity in every aspect of our platform" and "our attractive pipeline" as among the reasons why Viatris was "uniquely positioned" to "offset inherent erosion of our business," Malik said that "*taking all of these pieces into consideration, you should have an appreciation about our confidence in 2021 being a trough year.*"

71.    During the question-and-answer portion of the Investor Day, Defendants continued to express their unwavering confidence in Viatris's business model and its commitment to biosimilars. For instance, Barclays analyst Balaji Prasad asked about Viatris's commitment to biosimilars and openness to "changing" its "game plan," noting that one of Viatris's competitors was "signaling exit from the biosimilar strategy indicating that this is not as attractive as it was thought two years ago or one year

ago." In response, Goettler and Malik's unequivocally dismissed the possibility that Viatris would shift away from its focus on biosimilars, with Goettler putting it bluntly: "*[L]et me just summarize, we have no intention to get out of biosimilars, quite the opposite.*" Malik echoed that sentiment, stating: "*This is an area where we have decided to hang in, not get out. And for us, it's a long-term play.*"

72.    Defendants were no less definitive that Viatris's business model would ensure that 2021 would be the Company's trough year. When Wolfe Research analyst Akash Tewari asked how Viatris could guarantee 2021 would be a "trough year" given that the Strategic Roadmap indicated "sustainable growth" would not begin until Phase II in 2024, Goettler responded by reiterating that Viatris already had all it needed to ensure near-term growth from its 2021 starting point. "*We have all the levers in place now to be very confident to say that 2021 is a trough year,*" Goettler said, adding that this meant "*a trough year in revenue, a trough year in EBITDA and definitely a trough year on cash flow.*" And when UBS analyst Kevin Caliendo asked whether "new products can offset base business erosion" and "can sustain the company" after 2021, Malik responded by identifying the two objectives for the Investor Day: (1) getting analysts "comfortable about…*2021 being the trough,*" and (2) showing "the potential" of "these new launches or the revenues that is offsetting the base erosion" and also "proactively trying to manage the erosion."

73.    Following the Investor Day, many analysts published reports that favorably responded to Defendants' unwavering confidence in Viatris's business model and its commitment to biosimilars as a core part of the Company's long-term growth.

74.    For instance, that same day, Truist published a report titled, "Constructive first Investor Day; execution will be key," writing that "[w]e continue to see the potential for significant upside for the stock if the company executes," noting that Viatris "reiterated its commitment to biosimilars" and "will continue to expand its business through both partnerships and internal development." Similarly,

UBS published a report on that day that likewise noted Viatris was "Bullish on Biosimilars," explaining that Viatris's "goal is for biosimilars and complex generics to drive greater than 2/3 of product launches." And the next day, on March 2, 2021, Barclays published a report titled, "A Deeper Look into the Business at Viatris's 2021 Investor Day," which called biosimilars Viatris's "[c]ornerstone of future growth," adding that the Company "maintains its faith in Biosimilar Growth" and "[i]mportantly, greater than two-thirds of US/EU product launches in the coming years will originate" from Viatris's complex generics or biosimilars pipeline.

### III. Throughout the rest of 2021, Defendants consistently touted Viatris's business model and its commitment to biosimilars

75.    Throughout the remainder of 2021, during investor conferences and conference calls, Defendants continued to reiterate their unwavering confidence in Viatris's business model and its commitment to biosimilars as the key driver of growth that would offset inherent erosion in its base business and ensure that 2021 would be the Company's trough year.

76.    On March 10, 2021, Goettler, Malik, and other top executives presented to analysts and investors at the Barclays Global Healthcare Conference. At the conference, Goettler repeated his message from earlier that month that Viatris's business model and strategy was essentially complete, stating that "*all the strategic tenets that we've been talking about for two years now almost, right, are in place*." Goettler explained that those strategic tenets included: "a business that is transformative in global scale," a "diverse" and "differentiated" product portfolio, and "strong and sustainable cash flow."

77.    When Barclays analyst Balaji Prasad asked whether the Strategic Roadmap's plan for durable growth to begin with Phase II in 2024 meant that there would be "no growth till 2024," Goettler reiterated that they "*consistently said that we see 2021 as a trough year*," and then left no doubt that this refrain guaranteed near-term and long-term growth from 2021, adding: "*Now trough year*

*clearly means it's not going to go lower than this, right? And it was a trough year. That's for revenue. That's for EBITDA. And it's more certainly for cash flow, right?"*

78.    Prasad later focused on biosimilars, noting it was "a part of the business that I've always been very excited about" and an "opportunity is so massive" that "you're bullish on," and asked whether Viatris would continue to take its "partnered approach" to biosimilars rather than going "on it on your own." Malik responded by confirming that biosimilars was a "strategic area" and that Viatris's "partnership with Biocon is more of a strategic sort of relationship" that "we have done pretty well in executing" and that there was "enough capacity available" in manufacturing to support its partnership approach. But Malik made clear that biosimilars "*will continue to be one of the key growth drivers as we launch more and more of these products.*"

A.    **Defendants declare strong first quarter results "validate" Viatris's business model and define midpoint of 2021 earnings guidance to be the "true floor of our business"**

79.    Two months later, on May 10, 2021, Viatris announced its financial results for the first quarter of 2021. Defendants touted the "strong results" as demonstrating the "strength" of Viatris's "differentiated" business model, "its broad and diverse product portfolio," and its "strong R&D platform," as well as "[c]ontinued solid progress in advancing key pipeline programs for biosimilars, complex products and complex injectables," highlighting 27% growth in Complex Generics and Biosimilars (driven mainly by three biosimilars products).



Source: Viatris Q1 2021 Earnings, May 10, 2021

80.    In a conference call that Viatris held that day to discuss the results with analysts, Goettler reported that Viatris was "continuing to shift to more differentiated and sustainable portfolio with strong growth in Complex Generics and Biosimilar," with Malik later noting that biosimilars were "the key driver" behind strong growth in the important Developed Markets segment.

81.    Goettler then reiterated that they "continue[d] to feel strongly that 2021 is our trough year," which he then "defined" to be "the midpoint of our guidance of $6.2 billion adjusted EBITDA," adding that *"$6.2 billion is a true floor of our business, not just for this year, but also for future years."* Goettler explained that they were "highly, highly confident" that $6.2 billion in adjusted EBITDA was Viatris's "floor" because "we know all the levers that we can have," "[w]e know the robustness of our business," "we've got a good understanding of the base erosion that we have in the business," and "[w]e have a good understanding of the new pipeline revenue we can bring."

82.    Analysts were reassured by Defendants' unwavering confidence in Viatris's business model and certainty about its growth. For instance, in a report titled, "Reiterating Buy following strong first

quarter for VTRS," Truist wrote that Viatris "continues to feel strongly that 2021 will be a trough year" and is "'very confident' about the growth potential of the business following the first quarter performance," citing the Company's progress with multiple biosimilar products. Evercore shared that sentiment, writing in a report that the "single biggest question into Viatris earnings" was whether the Company's numbers "have bottomed out," and concluding that management's reiteration of their guidance "alone puts a lot of questions to bed."

83.    On the news of the first quarter results, Viatris's stock price rose by $0.96, or 6.82%, from a closing price of $14.08 per share the previous trading day to a close of $15.04 per share on May 10, 2021, with high trading volume of more than 30 million shares, more than double the trading volume the previous trading day.

84.    One week later, on May 18, 2021, Goettler and Viatris's Chief Financial Officer, Sanjeev Narula, spoke with investors and analysts at the RBC Capital Markets Healthcare Conference. In his opening remarks at the conference, Goettler continued to tout the key aspects of Viatris's business model, including its "broad and diversified product portfolio" that is "agnostic to any particular therapeutic area," and its "broad pipeline of complex and novel products," especially "our late-stage biosimilar pipeline." Goettler then reiterated his statement the previous week that Viatris's strong first quarter results "validate the success of that diversified and robust business model," which "can absorb headwinds in any particular part of the world, while seizing on opportunities when and where they present themselves."

85.    When RBC Capital Markets analyst Daniel Busby asked Goettler to explain the factors that gave him confidence to say that 2021 would be Viatris's trough year, Goettler underscored their confidence by explaining that when Defendants said 2021 would be the trough year for earnings, that meant that the midpoint of the adjusted EBITDA guidance for 2021, $6.2 billion, "*is the floor of our business going forward*," adding: "*So that's about as hard as a line as you can draw at this*

35

*point."* Goettler then explained that their confidence that 2021 would be Viatris's floor was based on their knowledge and understanding of Viatris's "robust business model," "base business" and its "natural erosion," and "what our pipeline can deliver." Goettler continued: "Our business model is very different from, let's say, brand pharma, where you have relatively limited portfolio that you focus on and it's centrally driven and then you kind of look for where you can sell it. *Our model is very different.*"

86.    The next month, on June 10, 2021, Goettler, Malik, and other executives spoke at the Goldman Sachs Global Healthcare Conference. In his opening remarks, Goettler again touted the key aspects of Viatris's business model, including its "broad and diverse product portfolio" that was "agnostic to any particular therapeutic area," explaining that this "diversity gives us stability" and "allows us to balance any kind of negative impacts in any particular part of the business." Likewise, Goettler again highlighted Viatris's "broad pipeline of complex and novel products," specifically "our late stage biosimilars," noting that the Company had many biosimilars in development "in oncology, ophthalmology, immunology, diabetes and others." And Goettler also expressed continuing confidence that $6.2 billion in adjusted EBTIDA was the "floor of our business going forward," again citing Defendants' understanding of the "headwinds and tailwinds" that the Company was facing and that its "diversified revenue base" would "absorb any kind of headwinds that we sign in any particular part of the business."

87.    When Goldman Sachs analyst Nathan Rich pressed Defendants about base business erosion in Viatris's product categories, Malik responded by emphasizing the importance of biosimilars, explaining that while the Complex Generics & Biosimilars category accounted for only 10% of their business at the time, Viatris was "*moving more towards the complex and biosimilars*" and that "*bucket of biosimilars is growing,*" citing the "27% worth of biosimilars growth" in the first quarter. Later, responding to a question from Rich about the breadth of Viatris's pipeline, Malik reported

that the pipeline was "moving from a value chain perspective" and that "[t]oday, almost 75% of our portfolio is around complex and biosimilars."

**B. Viatris reports continued biosimilars growth in the second quarter, highlighting "historic approval" of first interchangeable biosimilar in the United States**

88.    On August 9, 2021, Viatris reported its financial results for the second quarter of 2021, highlighting the FDA's "historic approval" of the first "interchangeable biosimilar" in the United States, Semglee, a diabetes drug marketed as a substitute for the reference product, Lantus. "The historic approval for the first interchangeable biosimilar in the U.S. we recently received is, perhaps, one of the most significant milestones to date demonstrating the success of our scientific capabilities," Malik said in a press release issued by Viatris that day. "We fully intend to leverage these scientific capabilities to continue to add high-value assets to our pipeline going forward, to break down barriers to access, bring forth first-to-market products and blaze new trails to increase access to complex treatments for patients."

89.    In a conference call that Viatris held that day to discuss the results with analysts, Goettler boasted that Viatris had performed "at or above the upper end of our own expectations across the entire business," including all four commercial segments and all three product categories. "Today's strong results," Goettler said, "validate the vision and the strategy we had in combining the two legacy organizations."

90.    But the spotlight stayed on biosimilars. Noting the "historic approval" of Semglee, Goettler reported that Viatris continued to make "steady progress" with its "biosimilar and complex products pipeline." Malik confirmed that progress, citing 40% growth in the biosimilar portfolio and explaining that "*we see our biosimilars portfolio driving continued growth while offsetting anticipated competition in our complex generic space*." When Evercore analyst Umer Raffat pressed Defendants on biosimilars, referring to them as "one of your key growth drivers going forward," Goettler cited the approval of Semglee and the Company's other progress in biosimilars as "*proof*

*points…that our biosimilar portfolio is strong*" and "*is going to be a driver of growth for us going forward.*"



Source: Viatris Q2 2021 Earnings, August 9, 2021

91.    Goettler cited these and Viatris's other successes again later in the call as further evidence supporting their confidence that $6.2 billion in adjusted EBITDA was the "true floor for this business," explaining that "with the performance we have under our belt now from both the first and the second quarter, it's more clear than ever to us that that's the case."

92.    Goettler later reported that Viatris continued to "make good progress in our rigorous bottom-up strategic planning effort," explaining that this effort would provide a "better understanding how our portfolio will evolve over the next several years" and "the strategic levers at our disposal," adding that this "work will complete towards the end of the year." But while that strategic planning effort was not yet complete, Goettler continued to reiterate their confidence in both near-term and long-term growth, stating: "*Let me just re-emphasize again what I also said in my prepared remarks is that we really see the $6.2 billion in EBITDA as the true floor for this business.*"

93.    Analysts responded favorably, citing the strong results and notable successes in biosimilars. For instance, in a report published on the same day, RBC Capital Markets reconfirmed its outperform rating and price target for Viatris's common stock, explaining that Viatris's "[p]ipeline remains an important part of the story highlighted by recent FDA approval for interchangeable biosimilar Semglee" and noting that Viatris "continues to advance other key pipeline programs as well including biosimilar Eylea, biosimilar BOTOX, and low-dose Xulane." In the report, RBC Capital Markets added that "[l]looking beyond 2021," Viatris "continues to work on its strategic planning process which it expects to complete by year-end" and "we expect the company to provide numerical long-term targets (for a minimum of three years), along with a more in-depth discussion of key drivers of the business going forward." Similarly, JPMorgan reported that it was raising its estimates for Viatris, explaining that "consistent execution will be key for the VRTS story as the Street looks to gain confidence on trough sales/EBITDA estimates (which is increasing looking like 2021) as well as the potential growth over these levels." The next day, Barclays published a report titled, "Multiple Positives as VTRS Journeys Towards Regaining Confidence," writing that they had raised their price target for Viatris common stock by 10% to $23 per share, citing Viatris's "extensive Biosimilars portfolio" as among the main reasons for their rating.

94.    On the news of the second quarter results, Viatris's stock price climbed by $0.85, or 5.96%, from a closing price of $14.25 per share the previous trading day to closing price of $15.10 per share on August 9, 2021, with a trading volume of more than 15 million shares.

95.    One month later, on September 10, 2021, Goettler and Malik spoke with analysts at the Citigroup BioPharma Conference. During the conference, Citigroup's analyst Navann Ty asked Malik about what "excites you the most in Viatris pipeline," to which Malik responded that while there were "many exciting opportunities in our pipeline," Viatris was "working diligently to move our pipeline towards more complex and the biosimilars," adding that an "outcome of this" was "a robust pipeline

with 75% of pipeline spend in" biosimilars. When Ty followed up by asking about Viatris's biosimilars "strategy going forward," Malik confirmed that "*biosimilars is and will continue to be an important area of the company and will be a key growth driver, a key driver for our future growth.*" Goettler then jumped in, adding that "from a strategy perspective, it's very clear that biosimilars is not a mature market yet, and it's a growing market" and "therefore, with the capabilities we have, *it is and will be and can be a growth driver for Viatris.*" Goettler then noted that Viatris has "one of the most diverse and strongest pipeline in biosimilars," adding that "what that means is in the future that portfolio, that pipeline will translate into a commercial portfolio gives us one of the strongest commercial portfolios in the industry."

96.    Goettler also explained that while they remained confident that "$6.2 billion of adjusted EBITDA" was "a true floor of our business going forward," this was meant as "a floor in an interim period while we're looking on our long-term outlook" and "strategic plan," at which point they will "give guidance for 2022 and years beyond." Goettler explained that they were "making good progress" with their "strategic planning efforts" to "understand how our portfolio would evolve over the next several years," which they expected to be "complete towards the end of the year." Ty followed up by asking whether Defendants could "show some of the – your internal long-term strategic planning assumptions to help us to have – for some visibility in the long-term," to which Goettler responded by explaining that "the intent is when we come out with the strategic plan that we give some further color and guidance on 2022 guidance and long-term perspective and good understanding of what the key drivers are."

### C.    With strategic planning process finished, Defendants continue to confirm that $6.2 billion in EBITDA is the "true floor" and that biosimilars remains catalyst for growth

97.    On November 8, 2021, Viatris reported its financial results for the third quarter of 2021, announcing that after the third consecutive quarter of strong results, the Company was raising its financial guidance for 2021. In a press release issued that day, Viatris raised its financial guidance

ranges for revenue to $17.7 to $17.9 billion (from $17.5 to $17.9 billion), adjusted EBITDA to $6.3 to $6.5 billion (from $6.15 to $6.45 billion), and free cash flow to $2.4 to $2.6 billion (from $2.2 to $2.4 billion). Viatris also announced that it would hold a virtual Investor Event to take place January 7, 2022 to discuss "more details" about the Company's "Two-Phased Strategic Roadmap," as well as the results of "a rigorous bottoms-up strategic planning effort" that was "near completion."

98.    In a conference call that Viatris held that day to discuss the results with analysts, Defendants touted the strong results and successes in biosimilars, with Goettler highlighting that Viatris had filed a BLA for the biosimilar to Eylea and noting the potential to be "first-to-market for our BOTOX biosimilar." Malik likewise touted the "continued growth of our global biosimilars portfolio this quarter, which grew by 14% and helped to offset anticipated competition related to select complex generic products."

99.    Reporting that they were "near completion" of their "strategic planning effort," Goettler explained that they would be sharing the results of that effort at the January 2022 investor event, which would include "specific financial guidance, targets, and metrics to complete" Phase I of the Strategic Plan. Goettler later explained that with this strategic planning process "now finished or almost finished," they were "***reconfirming again what we said before, the $6.2 is the floor***," adding "that means floor, doesn't mean midpoint of the guidance, it's the floor." Goettler stressed that it was "very, very important" for $6.2 billion in adjusted EBTIDA to be the "floor" of the business, because it "drives how we can deliver on Phase 1," including "the substantial free cash flow that we will be generating over this period to satisfy our Phase 1 capital allocation priorities of returning capital to shareholders and of repaying $6.5 billion of debt."

100.    When Goldman Sachs analyst Nathan Rich pressed Defendants about their expectation that revenue, adjusted EBITDA, and free cash flow would would decline in the fourth quarter of 2021, Defendants attributed the expected decline to evolving product mix and onetime events, with Malik

emphasizing that "*there is nothing I see that concerns me regarding the underlying fundamentals of the business getting into Q4 or for that matter, exiting this year into beginning of next year*."

101.   Analysts were reassured by the news. For instance, on November 8, 2021, Barclays published a report titled, "2022 Returns Likely Driven by Extensive Pipeline of Biosimilar & Complex Products," raising its price target for Viatris common stock by $1 to $24 per share, explaining that their rating was based on Viatris's "1) extensive Biosimilars portfolio and partnership with Biocon which we think gives it an edge, 2) truly diversified global segments, and 3) complex Generics portfolio." Barclays added that while Viatris's stock price was up about 7%, "meaningful inflection in the stock will occur with greater confidence on its pipeline [and long-term] outlook," adding that Viatris "has one of the best pipelines of Biosimilars & Complex products" and they expected "deeper insights into this to be the core of the Jan Investor Day event."

102.   On the news, the price of Viatris common stock rose by $0.95, or 6.92%, from a closing price of $13.73 per share the previous trading day to closing price of $14.68 per share on November 8, 2022, with trading volume of more than 18 million shares.

103.   The next month, on December 1, 2021, Goettler, Malik, and other executives attended the Evercore ISI HealthCONx Conference. Evercore analyst Umer Raffat began by noting "a lot of buzz" about "one of the big three generics business potentially getting spun out of Novartis," citing an interview with Novartis Chairman Jörg Reinhardt that discussed "any possibility of a combination with one of the large players like Teva or Mylan/Viatris." Raffat then asked: "Is that even something you guys are even contemplating?" Goettler responded by reiterating that "our strategy has been very clear," with their Two-Phased Strategic Roadmap, but then confirmed that "we also read the report this morning of what Jörg Reinhardt commented," adding: "I can tell you, *we haven't had any*

*discussions on the topic*. Of course, if there's a possibility to create more shareholder value, we consider it, *but it's not something we're actively considering at this point.*"

104.   Raffat followed up by asking Goettler to confirm their expectations for growth and EBITDA in the two phases of the Strategic Roadmap, noting that the market's expectations were that Phase I was a "a near-term phase where business has been modeled to be flattish" and Phase II was "a post 2023 phase when some of the investments historically from the R&D organization into biosimilar starts." Goettler confirmed that Raffat was "looking at it right," stating they would "lay out on our Investor Day exactly how we deliver on our commitments for Phase 1" and would "give you the *catalyst for the growth in Phase 2*," adding that "*the catalysts are our pipeline which we think is underappreciated*" and Viatris has "*some very strong investments in biosimilars, in complex generics that will drive it.*"

105.   Raffat later asked Malik and Goettler about the impact of "inflation on raw material prices heading into 2022," to which Goettler responded by explaining that Defendants had taken inflation, as well as other headwinds, such as natural erosion and foreign exchange pressure, into account when they concluded that $6.2 billion in adjusted EBITDA continued to be the floor.  "We have got the natural erosion, we got the pipeline that Rajiv mentioned, *we've got inflationary pressures, we got the FX, we've got all these things*" and "*taking all of them to account…we remain confident that the $6.2 billion we put out there as a floor continues to be the floor*." Malik agreed, reiterating that "*the key thing to note about it is the $6.2 billion as the floor.*" Raffat commented that Goettler's and Malik's answers indicated "there's enough levers in the business to pull to ensure the EBITDA strength – EBITDA momentum continues even while absorbing impact from a gross margin pressure," to which Goettler responded by reiterating that while they were not giving guidance, "*the $6.2 billion is the floor and we're confident in that*."

## IV. Viatris stuns market by unveiling "global reshaping initiative" to "reshape the entire company," starting with sale of entire biosimilars business

106. On February 28, 2022, Defendants shocked the market by unveiling a "global reshaping initiative" that would "reshape the entire company" to be "a simpler, stronger and more focused company," starting with the sale of Viatris's entire biosimilars business to Biocon Biologics. In describing the reshaping initiative, Defendants outlined a fundamentally different business model that differed in nearly every key respect from the business model that Defendants had consistently touted for nearly a year, as summarized in the chart below:

| 2021 Business Model | 2022 Reshaped Business Model |
|---|---|
| "A new kind of health care company, differentiated by a global operating platform with significant scale" ¶ 155. | "A simpler, stronger, and more focused company. ¶ 106. |
| "[A] broad and diverse product portfolio, that includes brands, that includes generics, that includes complex generics and biosimilars." ¶ 165. | "A durable higher-margin portfolio consisting of generics, complex products, and off-patent brands" with "an innovative growth engine of NCEs and 505(b)(2)s" ¶ 107. |
| "That Portfolio is…agnostic to any particular therapeutic area." ¶¶ 84, 86, 155, 160, 165. | "[I]n three core global therapeutic areas: ophthalmology, gastrointestinal, and dermatology." ¶ 113. |
| "[A] strong R&D platform that is well positioned to deliver a broad pipeline of complex novel products, including late-stage biosimilar programs." ¶ 165. | R&D and business development to build a "critical mass of new chemical entities and 505(b)(2)s novel products" in the 3 focused therapeutic areas." ¶ 115. |
| "[B]iosimilars is and will continue to be an important area of the company and will be a key growth driver" and "core part of our forward-looking Viatris portfolio." ¶¶ 60, 95, 143. | A "couple years from now, biosimilars will not be a part of [our pipeline]." ¶ 125. |

107. Instead of "a broad and diverse portfolio" spanning "all categories" of products, Viatris now would "reshape our portfolio" towards a "durable higher-margin portfolio consisting of generics, complex products, and off-patent brands" with "an innovative growth engine of NCEs and 505(b)(2)s." In lieu of a portfolio that was "agnostic to any therapeutic area," Viatris would focus on just three "targeted therapeutic areas": ophthalmology, gastrointestinal, and dermatology. And rather

than a broad pipeline focused on biosimilars, Viatris would sell its entire biosimilars business and instead concentrate its pipeline on gastrointestinal, ophthalmology, and dermatology products.

108.  In his opening remarks at the Investor Event, Goettler revealed that the reshaping initiative was the "output" of an "extensive," "comprehensive," and "thorough strategic review of our entire business" that Defendants conducted "throughout 2021." Goettler explained that this "thorough strategic review" resulted in determinations about "what was core and what was noncore to the future of our company." The "first-but-critical step" of the reshaping initiative, Goettler said, was selling one of these "noncore" assets, Viatris's biosimilars business, to Biocon Biologics.

109.  On the same day, Viatris filed a Current Report on Form 8-K with the SEC, which disclosed that Viatris had entered into a Transaction Agreement with Biocon Biologics, under which Viatris would sell its entire biosimilars portfolio. The Transaction Agreement, which was attached as an exhibit to the filing, indicated that Viatris and Biocon began discussions about the sale of Viatris's biosimilars business sometime before the fall of 2021 because it eventually led to them entering into a Confidentiality Agreement to facilitate the negotiations for the Biocon Biosimilars Transaction on October 26, 2021.

110.  This was the first time the market learned the Company had been engaging in a year-long "thorough strategic review." While Defendants had alluded to an ongoing "strategic planning exercise" or "process" since Viatris's Investor Day in March 2021, they consistently characterized (and analysts understood) that exercise as focused on providing "further color" on "our long-term outlook," *see* ¶ 96, as well as "specific financial guidance, targets, and metrics" for Phase I of the Strategic Roadmap in "2022 and years beyond," *see* ¶¶ 99, 189. Unlike Mylan's 2018 Strategic Review, which was publicly announced at the outset and described its scope, *see* ¶¶ 40-44, Defendants kept the scope of the 2021 Strategic Review a secret. Indeed, until that point, Defendants led analysts and investors

to believe that Viatris' business model was "essentially complete" with "all the strategic tenets…in place." *See* ¶¶ 57, 76.

111.  But while the 2021 Strategic Review was not disclosed until it was completed, its scale was no less significant than Mylan's 2018 Strategic Review. The 2021 Strategic Review resulted in multiple "reshaping initiatives" to "reshape the entire company," including not only the divestment of biosimilars, the Company's key driver of growth, but also billions of dollars of unidentified assets amounting to between $4 and $6 billion, which Goettler claimed would generate up to $9 billion in pretax proceeds "trading off approximately 20% of our current adjusted EBITDA."



Source: Viatris Investor Event Presentation, February 28, 2022

112.  Viatris's CFO, Sanjeev Narula, later presented the immediate impact that the reshaping initiative would have on Viatris's near-term financial performance, comparing Viatris's estimated 2022 performance with an illustrative pro forma estimate of what the Company's performance could look like after the Biocon Biologics Transaction and after execution of the divestment plan for other select assets. Narula explained that the transactions would result in $4 to 5 billion of after-tax proceeds that

could be deployed for investing into business and returning capital to shareholders in exchange for

losing an estimated $200 million in EBITDA from biosimilars and $300 to $500 million in EBITDA

from other select assets that would be divested later.



Source: Viatris Investor Event Presentation, February 28, 2022

113. Goettler also explained that they would transition away from the "broad and diverse portfo-

lio" that was "agnostic to any therapeutic area," which Defendants had consistently touted as a

"strength" that would ensure "stability." Instead, Goettler explained that they would "reshape our

portfolio towards higher margin, more durable assets such as NCEs and 505(b)(2)s" (referring to types

of new drugs routed through specific FDA approval processes) in "three core global therapeutic areas:

ophthalmology, gastrointestinal, and dermatology." Goettler explained that this decision was the result

of a "thorough analysis" the Company's "current strengths and capabilities," as well as "market sizes

and growth opportunities," "unmet medical need and the opportunity for innovation," and "the avail-

ability of Phase II and Phase III late-stage assets." From that analysis, Goettler said, the "results were

clear," finding that "some therapeutic areas had too much competition or too much scientific risk for

us to see a credible path to leadership in the time horizon that we're looking at" and "others were too small or didn't provide enough room for innovation." But Goettler said three therapy areas, ophthalmology, dermatology and gastrointestinal, "particularly hit the sweet spot for us," explaining that while Viatris "may not pursue all of these equally at the same time," those three areas "represent the kind of therapeutic area where we have the ability to leverage our existing infrastructure and maximize the opportunities."

114.  While Viatris had decided to focus on these three therapeutic areas, Goettler explained that the Company would seek to acquire an "anchor asset in 1 or more of the 3 therapeutic areas," admitting that Viatris was still searching for an "anchor asset" and stating that they had only one product in ophthalmology,  an exclusive license for an ointment for treatment of blepharitis, a common type of irritation, which Goettler said would "contribute to ophthalmology franchise while we continue to search for an anchor asset."



Source: Viatris Investor Event Presentation, February 28, 2022

115.  Malik then provided additional details about their plan to reshape their R&D platform and pipeline, explaining that they would transition away from their current "portfolio and pipeline," which was then "diverse across a wide range of therapeutic areas across segments and markets," to focusing instead on R&D and business development to build a "critical mass of new chemical entities and 505(b)(2)s novel products in the 3 focused therapeutic areas of GI, ophthalmology and dermatology." Malik said that Viatris's "pipeline, excluding biosimilars," was "well-positioned to deliver approximately $500 million plus in new product launches annually after '23," compared to "$600 million of expected new product launches in '22, of which about 1/3 is related to biosimilars."



Source: Viatris Investor Event Presentation, February 28, 2022

116.  Defendants coupled their announcement of the reshaping initiative with another surprise, revealing that their guidance for fiscal year 2022 forecasted revenue between $17.0 and $17.5 billion, adjusted EBITDA between $5.8 and $6.2 billion, and free cash flow between $2.5 and $2.9 billion. Viatris's 2022 guidance surprised the market, because the highpoint of its range for adjusted EBITDA was $6.2 billion, which Defendants had repeatedly defined to be the "true floor of our business."

Defendants attributed this lower-than-expected guidance to mainly two factors: inflation and foreign exchange. But as recently as December 2021, Defendants continued to express unwavering confidence that $6.2 billion in adjusted EBITDA was the floor, even accounting for inflation and foreign exchange pressures. *See* ¶ 105.

117.  Analysts and investors were shocked by Viatris's stunning announcement.. During the question-and-answer portion of the Investor Event, analysts grilled Defendants about the decision to "reshape the entire company" and "reshape our portfolio" by selling the entire business, long viewed as the Company's best known growth driver.

118.  Asking the first question, JPMorgan analyst Christopher Schott pressed Defendants to "clarify what triggered" the "divestiture strategy," which he noted was "*a bit of a departure from kind of the broader portfolio that was created with the original Upjohn-Mylan transaction*," asking whether the reshaping decision was "a valuation-driven decision" or a decision driven by "the performance of the business" after further understanding "some of these assets."

119.  Malik's response was a sharp departure from Defendants consistent statements throughout 2021, which touted a business model that differentiated Viatris from its competitors and was "essentially complete," with "all the strategic tenets that we've been talking about for two years now…in place." *See* ¶¶ 57, 76. Instead, Malik suggested that Defendants effectively started from scratch and that, throughout 2021, they "took a hard look on our businesses" and evaluated "what are the must-haves," explaining that "[w]e took time to look into each and every aspect of our business and said, okay, how can we unlock the value? And how can we reshape the company for future and set it up where it needs to go?" Goettler added that this process included identifying divestitures, which was driven by "a question of is it core and noncore for the future of our business going forward" and "does it help us to simplify the business and reduce execution risk and complexity of the business that we have."

50

120. Bernstein analyst Aharon (Ronny) Gal bluntly noted that Defendants' reshaping initiatives were a stark departure from the business model and strategy they had been touting for the last year. "You're kind of doing a kind of a big shuffle here," Gal said. "I was kind of under the impression that your strategy was. We have this global presence. We're just going to license products from [indiscernible] companies and put that on that basis and that will be our strategy. And now you seem to be kind of shifting this to focus on specific 3 areas, one of which you would probably pick." Gal then asked, "Is that full strategy simply not viable? Can we simply not take therapeutic-agnostic products and launch them globally using your infrastructure?"

121. In response, Goettler insisted that they were "not walking away from anything here," but then admitted they were focusing on an "innovative, higher-margin, more durable portfolio" and "if you go into that innovative space, you have to do it in a focused way. You cannot build therapeutic area leadership by having -- being in 7 different therapeutic areas." Goettler's explanation was starkly different from his consistent statements over the last year, which had touted Viatris's portfolio that was "agnostic to any particular therapeutic area" as providing "stability." *See* ¶ 86.

122. Bank of America analyst Jason Gerberry confronted Defendants with the abrupt change in strategy and planned divestitures, noting that to "put out a slide deck like this, presumably, you guys are pretty far along to have gotten some line of sight that these valuation multiples are truly attainable." Malik reiterated that the process involved "a bottom-up process about what's core, what's not core, where the company is heading," confirming that Gerberry was correct that the Company had "not only identified" but has "done some work to put that value over there," and thus was "pretty much on the way."

123. Raymond James analyst Elliot Wilbur then commented that the market might end up endorsing the strategic shift "to more of an NCE, 505(b)(2)-based strategy, while not necessarily maybe fully understanding sort of why you chose the therapeutic categories you did," but explained that "the

increasingly difficult part is to try and figure out sort of what kind of the new baseline is for the company in revenue and EBITDA. Given "all these moving parts" in terms of "potential asset divest-itures," Wilbur asked, "if we want to and need to think about 2023 and beyond, I guess, it's just sort of difficult for us to think about like, okay, what is the year in which the company begins to grow? And what is that number from which the company can grow from?"

124. In response, Goettler admitted that "the best we can do right now is give you a pro forma that we laid out in the presentation" about "what it would look like, after we're done with all the strategic initiatives," which estimated revenue of $14.5 to $15.5 billion (excluding $900 million from biosimilars and $1 to $1.5 billion from other divested assets), and adjusted EBITDA of $5 to $5.6 billion (excluding $200 million from biosimilars and $300 to $500 million from other divested assets). *See* ¶ 112. Goettler acknowledged that "[w]hat we can't give you yet is what we're going to add to that," which depended on products developed from investments in R&D or "business development in the 3 therapeutic areas," adding "that part is missing."

125. BMO Capital Markets analyst Gary Nachman questioned Malik's remarks that the biosimi-lars were "approaching a mature phase" given that Defendants' statements over the last year suggested that "we were just sort of scratching the surface there in terms of biosimilars." Indeed, in September 2021, Goettler had said that biosimilars was there was "no doubt" that biosimilars was "not a mature market yet, and it's a growing market" and thus "it is and will be and can be a growth driver for Viatris." *See* ¶¶ 89, 192.

126. Malik responded by confirming that "[a] couple years from now, the biosimilars will not be a part of [the pipeline]" and then claimed that "biosimilars [is] moving towards a mature phase:" and that he was now "looking at a decade ahead" and the "journey which biosimilars have covered over the last 5, 6 years" and that "this was the right next evolution, right next call."

127. Analysts also pressed Defendants on Viatris's financial guidance for 2022, which estimated adjusted EBITDA to land between $5.8 and $6.2 billion, with a midpoint of $6.0 billion, well below the $6.2 billion that Defendants had repeatedly reiterated was the "true floor of our business." For instance, Barclays analyst Balaji Prasad questioned what caused the change, noting that Malik "had called out $6.2 billion as the floor in the last call," which seemed "to be the higher end of the range now," asking what had changed "to have this delta and believe that this includes the biosimilars business as part of 2022." Bank of America analyst Jason Gerberry also questioned the Company's EBITDA guidance, noting that while costs may have gone up, Viatris "had the opportunity to pull forward cost synergies" and "seemly you've got some benefits as well."

128. Viatris's CFO, Sanjeev Narula, responded by attributing the Company's lower EBITDA guidance to "2 important factors that are not unique to Viatris," but are "industry-wide." The first factor, Narula said, was "foreign exchange" impact from the strengthening of the dollar in the "second half of last year and beginning of this year" causing "2% headwind" on EBITDA amounting to $120 million. The second factor, Narula said, was "inflation on the input cost…causing an increase in the cost, which is again an industry-wide" and amounted to "about $196 million." Notably, Defendants repeatedly said that their confidence that $6.2 billion was the "floor of our business going forward" was based on, among other things, their understanding of the "headwinds and tailwinds" for the Company and that its "diversified revenue base…helps us to absorb any kind of headwinds that we find in any particular part of the business." *See* ¶¶ 86,105. Indeed, just two months earlier, in December 2021, Goettler reiterated their confidence that "the $6.2 billion we put out there as a floor, continues to be the floor," telling investors that they had accounted for any impact from inflationary pressures and foreign exchange. *See* ¶¶ 105, 199.

129. In the wake of Viatris's stunning announcement of its global reshaping initiative, analysts expressed surprise and confusion by the Company's sudden about-face with its entire business model

especially given that the market was entirely unaware that the Company had been engaging in a year-long "thorough strategic review" that could result in fundamentally changing the Company's business model and growth outlook. Though many analysts welcomed the strategy shift, which was consistent with their criticism of Mylan's troubled business model, they noted that the change was at odds with Defendants' statements throughout the past year.

130.  For instance, on February 28, 2022, Piper Sandler issued a report titled "Ugly Guide, With a Lurch to New Strategic Priorities," writing that Viatris's sudden pivot created a "***credibility cap***," noting that "***lurching from strategy to strategy is hardly investor-friendly***." Piper Sandler's analysts wrote that given Viatris's decision to "divest other assets it now deems as non-core," and "pivot to the acquisition of brand assets," they could only conclude that "despite all its rhetoric since the closing of MYL/Upjohn merger," Viatris was "essentially throwing in the towel regarding key aspects of the business model that emerged from that transaction," also writing, in relevant part, as follows:

> *Given the Biocon biosimilars transaction (see below for more details), management's plan to divest other assets that it now deems as non-core, and a pivot to the acquisition of brand assets, we can only conclude that VTRS, despite all its rhetoric since the closing of MYL/Upjohn merger, is essentially throwing in the towel regarding key aspects of the business model that emerged from that transaction.* We actually endorse this course correction (namely the focus on brands), *though the pivot does create something of a credibility gap (i.e., lurching from strategy to strategy is hardly investor-friendly).* A below-the-street 2022 guidance also doesn't help. Taken together, we remain cautious on VTRS shares given the continued lack of visibility into the longer-term trajectory of EBITDA.
>
> …VTRS is selling its biosimilars assets to Biocon for $3B upfront (~$200M in estimated 2022E EBITDA from these assets, per VTRS). What was notable to us was that management made it clear that it is aiming to use proceeds from this sale, and additional divestitures, to acquire brand assets (i.e., new chemical entities and 505(b)(2)-based products). We believe this is logical, and is generally in keeping with our broader view that it would behoove U.S. major generics companies to lean more heavily into brand assets as a means of diversifying away from their legacy generics businesses while at the same time providing more visibility into margin expansion and EBITDA sustainability (i.e., less exposure to assets where competitive headwinds/pricing erosion are consistent pitfalls). T*he challenge, of course, is that competition for these kinds of assets is undoubtedly intense, and given VTRS' sheer size, it would take quite a bit of deal/development activity to create a brand portfolio that can move the needle from an EBITDA perspective.*

131. Analysts also reacted to Viatris's failure to achieve performance above its declared "floor" of $6.2 billion in adjusted EBITDA. On March 1, 2022, Raymond James issued a report titled "Downgrading to Market Perform; Outlook Disappoints, Shares Hammered, Déjà vu All Over Again," downgraded their rating for Viatris's stock. "The only real constant emerging from the legacy Mylan-Upjohn combination has been the continued ability for EBITDA to shrink despite numerous attempts to draw a line in the sand around a base level from which management was expected to layer in additional growth assets," Raymond James wrote. *"Given that our investment thesis was largely predicated on near-term EBITDA stability yielding to modest growth scenarios post 2023, we are downgrading [our rating] as management has signaled another significant reshaping of the business, one that could significantly extend return-to-growth scenarios as the company accelerates R&D spend to pursue branded strategies in new targeted therapeutic areas.*" Raymond James concluded that "[n]et net, today's release and management outlook have decidedly turned *VTRS into much more of a show me story that it was already,*" dismissing the Company's "enhanced capital allocation initiatives" like a new $1 billion share repurchase program by noting that "*given the recent split with primary growth engine coupled with increasing uncertainty around resumption of sustainable EBITDA growth, reliance on mere capital allocation strategies as the primary share price catalyst afford little more than near-term trading opportunities in our view.*" Focusing on the biosimilars sale, Raymond James wrote that they "*saw the biosimilars business as the main source of excitement and future growth, at least on the top-line, in a company that had seen steep base business erosion.*" Noting Viatris's strategy shift to focus on "targeting global NCEs and 505(b)2 drugs" and "three targeted therapeutic areas VTRS plans to center the longer term strategy around," Ophthalmology, Dermatology, and Gastrointestinal drugs. Not necessarily known for the size or opportunity of their respective markets, Raymond James wrote, "the three new [therapeutic areas] are interesting at best."

132. The next day, UBS published a report titled, "Analyst Day Recap: Some Positives But On Balance, More Questions; PT to $12 (from $16)," that announced it was cutting its price target by 25% from $16 to $12, expressing disappointment in Viatris' guidance given Defendants' repeated and unwavering confidence that 2021 was the "trough year" and "floor," explaining that given management's "repeated assurance" that 2021 "*would be a trough year, the pivot from the prior guide and sparse financial guidance past 2022 were disappointing*." UBS continued by writing that this problem was only "magnified" by Viatris's sale of its biosimilars segment, its "*historical growth driver*," with more divestitures to come. While UBS acknowledged that the biosimilars sale would provide Viatris with an influx of cash providing flexibility for deleverage and cost optimization, they noted that "*we struggle to find enough pluses to offset MSD base business erosion and it seems many of the growth drivers (successful commercialization of complex generics, etc.) are anchored on hypotheticals.*"

133. On March 4, 2022, Cowen & Company published a report titled, "Cleaning Up this Mess Will Take Time and Outcome is Uncertain," explaining that "Viatris announced their decision to transition to a more innovative product portfolio with plans to divest a number of franchises, the most surprising of which includes the decision to exit biosimilar business to Biocon for $3.335B, which had been positioned to be one of the most durable." In their report, Cowen continued by explaining that while they "commend this acknowledgement of the broken model they were presiding over, the assets, capabilities, and competency are what they are, and we have no confidence that the transition will either be successful, or that this management team will be able to create any meaningful value from these levels."

134. On March 15, 2022, Piper Sandler published a report titled, "4Q Post-Script: An Extended Period in the Penalty Box on Tap," which explained that Viatris' "*decision to divest its biosimilars segment (a business that VTRS had consistently touted as core to its longer-term growth*"

*strategy) and to pursue other divestiture*s" created "*a long road ahead before visibility into the company's new brand-focused strategy will come into focus*," adding that "*it is not even clear to us that management will be able to execute on the acquisition of high-quality brand assets that can position the business for longer term EBITDA sustainability*." Commenting on the other "noncore assets" that Defendants announced would generate, together with $2 billion from the Biocon Biologics Transaction, up to $6 billion in potential pre-tax proceeds, Piper Sandler wrote, in relevant part, as follows:

> Beyond the ~$2B in upfront proceeds associated with the divestiture of biosimilars to Biocon (refer to our note on 2/28/22 for more details), management stated that it identified up to $6B in potential pre-tax proceeds from additional divestitures by the end of 2023. *Of course, we do not know which segments are being shopped by VTRS, nor do we know if this figure is even grounded in reality. It all adds up to a lot to ask of investors: essentially trust that management can execute on additional divestitures at reasonable multiples, and in parallel identify and vet brand assets (both new molecular entities (NME) and 505(b)(2)- based products), bearing in mind that this team does not have a deep track record on this front.* To the extent that management can actually pull this off (particularly to the extent that it can divest some of its legacy generics assets and reduce its overall exposure to generics, and then pivot to higher-quality brands), potentially significant value recovery/ creation would be in order. *However, we are staring down a process that is likely to take a few years. During this interregnum, how are shareholders supposed to be rewarded?*

135.  Piper Sandler continued by commenting on the 2022 guidance, which it described as "a collection of negative surprises," writing, in relevant part, as follows:

> *The guide essentially amounted to a collection of negative surprises.* For instance, management is guiding to an annual decline of ~8% in its emerging markets and JANZ (Japan, Australia, New Zealand) segments, respectively (inclusive of biosimilars). Part of these declines are a function of base business erosion of ~1%-2% in emerging markets, and the impact of mandatory price cuts in Japan, respectively. *These are exactly the kinds of dynamics we worry about when we cite a lack of visibility into the trajectory of EBITDA.* With that in mind, it does not appear that new approvals/launches (e.g., VTRS' recent FDA approval of its generic of Astra-Zeneca's (AZN; not covered) $1B+ brand (U.S. only) Symbicort; and yes, we expect an at-risk launch) are enough to drive visibility into EBITDA sustainability. *Biosimilars were certainly thought to be a segment that could give VTRS a fighting chance at driving EBITDA sustainability. Of course, the divestiture renders that idea moot.*

136.  The market immediately responded to Viatris's decision to fundamentally reshape its business and abandon the biosimilars segment seen as the cornerstone of the Company's growth, with Viatris's stock price plummeting by $3.53, or approximately 24%, from a closing price of $14.54 per share on the previous trading day, February 25, 2022, to a close of $11.01 on February 28, 2022, with abnormally high trading volume of more than 62 million shares—nearly 400% the volume the previous trading day. Covering the news, *MarketWatch* published an article titled, "Viatris stock slides 24% as analysts say sale of biosimilars to Indian partner removes key growth driver," explaining that "shares initially jumped on the news, before reversing course to trade down 24%, as analysts said it would remove a key growth driver." The stock has remained in the $9 - $11 range for the past twenty months closing Friday October 20, 2023 at $9.30 per share.

Viatris Common Stock, March 1, 2021 to July 25, 2022

## EXCHANGE ACT VIOLATIONS

### I.    Materially False and Misleading Statements and Omissions

137.  As summarized below, throughout the Class Period, Defendants made many false and mis-leading statements concerning: (1) Viatris's business model and strategy to leverage its broad and di-verse portfolio spanning all categories of pharmaceutical products, including brand-name drugs, ge-nerics, complex generics, and biosimilars; (2) Viatris's commitment to biosimilars as the Company's key growth driver and core part of the Company's long-term strategy to offset inherent base business erosion; and (3) Viatris's growth strategy, outlook, and potential, specifically its growth from its 2021 "trough year" and "floor" of $6.2 billion in adjusted EBITDA.[1]

### A.  March 2021 Investor Day

138.  On <u>March 1, 2021</u>, Viatris held its inaugural Investor Day, during which Defendants made the false and misleading statements about Viatris's growth outlook and potential.

139.  Throughout the event, Viatris's CFO repeatedly emphasized that "2021 is a trough year" for the Company, stating, in relevant part, as follows:

> First, let me start with our 2021 guidance we shared last Monday. I want to punctuate a few points. I believe we accomplished the goal to give you enhanced visibility and understanding across P&L and cash flow. *I want to reiterate that 2021 will be a trough year for revenue, adjusted EBITDA and free cash flow*…

> Going forward, not all estimated savings for restructuring activities expected to impact adjusted EBITDA because certain historical costs were already being excluded from adjusted EBITDA. *Again, just as a reminder, 2021 is a trough year for free cash flow.* I expect the cash flow to grow significantly over the next 2 years.…

> Now based on that, we're not providing a long-term EBITDA guidance, *but one thing I can clearly tell you that our 2021 is the trough year for EBITDA, cash flow and revenue*, and that is what's there and particularly for free cash flow, we're expecting that to rapidly grow as some of the onetime payments go down.

---

[1] Plaintiffs allege that the statements in bold and italics within this Section were materially false, misleading, and/or omitted to disclose material information.

140.  Responding to a question from Wolfe Research analyst Akash Tewari to explain the differences in Viatris's growth outlook in the two phases of its Strategic Plan given their statement that "2021 will be a trough year on revenue," Goettler stating, in relevant part, as follows:

> Tewari:      I just want to make sure the messaging I'm understanding. So on Slide 12, you're saying you're not going to see top line revenue growth until 2024, but you're also alluding that 2021 will be a trough year on revenues. Given some of the China headwinds, some of the rationalizations you're alluding to in JANZ and some of the developed markets, are you saying that top line revenues might be choppy, up and down from 2021 to 2023 and then start growing in 2024 onwards?

> Goettler:    Yes, Akash, thanks for the question. And look, as we said, we gave 2021 guidance. We're not going to give a quantitative guidance for '22 and '23. That's going to come at a later point, where we have the ability to really build this bottom-up with quality. Everything we're going to give to you is with quality.
>
> But what we can say and that you see that in the slides, the ones that we quoted and others, is that we have ***all the levers in place now to be very confident to say that '21 is a trough year.*** And as Sanjeev just said, a ***trough year on revenue, a trough year on EBITDA and definitely a trough year on cash flow.***

141.  Later, Malik responded to a question from UBS analyst Kevin Caliendo about Viatris's "organic growth" and whether "new products can offset base business erosion beyond 2021 on the EBITDA line," stating, in relevant part, as follows:

> Caliendo:    I think we're all trying to edge around the same question around sort of organic growth, and the 1 number that just keeps popping up to me is that in 2021, your expectation for new product growth is $690 million, which is -- exceeds the traditional or typical year for the company. Yet, it still wasn't enough to offset the base business erosion and the EBITDA line. I guess what my question is, and we're all kind of asking it, saying in different ways is, do you think that new products can offset base business erosion beyond 2021 on the EBITDA line? Meaning, is this something that can sustain the company beyond 2021 as we go -- before we get to 2024 and the expected sort of top line growth?

> Malik:       No, and look, ***one of the reasons we wanted to make sure, first of all, you guys get comfortable about the '21 being the trough year.*** That was one of the objective today. The second objective was we give you insight into this platform and show you the potential of not only these new launches or the revenue synergies offsetting the base

erosion, but also our proactively trying to manage the erosion because we -- once we get over here, 1% -- if you can erase the decline of 1% tail products, that takes off the pressure of your new product launches, which you have and all those. So there are many levers.

142.  The statements set forth in paragraphs 139 to 141 above were false and misleading when made. It was misleading for Defendants to state that "all the levers in place now to be very confident to say that 2021 is a trough year" without disclosing that Viatris was conducting a "thorough strategic review" in which Defendants were actively and seriously considering whether parts of the business were "core" or "noncore." Thus, Defendants did not know whether Viatris had "all the levers in place" to be confident that the Company's revenue, EBITDA, and cash flow would improve from 2021 results. In fact, as Defendants later revealed, the result of the strategic review was the Company's divestment of its biosimilars business after determining that it was not a core part of the business, which, coupled with other planned divestitures, Defendants admitted would result in an estimated pro forma adjusted EBITDA of $5 to $5.6 billion in 2022, well below the 2021 financial guidance. *See* ¶¶ 112, 124.

143.  During the Investor Day event, Defendants also made false and misleading statements about Viatris's business model and commitment to biosimilars. In his remarks, Malik emphasized that Viatris was committed to biosimilars as a "core part of our forward-looking Viatris portfolio," stating, in relevant part, as follows:

Now let's move into the second segment, which is perhaps -- which has got a lot of attention, the complex generics and biosimilars portfolio.

Our goal over the last few years has been to move up the value chain from a science perspective. The complex generics and the biosimilars require, not only just high R&D spend, I think it requires a high level of the science, more complex science, executing through that complex science, regulatory strategy, IP legal skill sets. And I believe we have already shown that we have those core competencies to excel in this space through some first-to-market successes like generic Advair, generic to the Advair, generic to the Copaxone, biosimilar to Neulasta, biosimilar to Herceptin, and I can go on.

While we are very proud of our track record, we also believe that we can do a lot more in this space and better serve the patient needs by breaking down these barriers. *These investments have enabled us to see durable long-term revenue streams as compared to the core generics. And we see this as a core part of our forward-looking Viatris portfolio.*

Let me give you some color on our biosimilars business. The global biosimilar market is still in a very early stage and evolving. We know there's a lot more headroom for biosimilars. Today biosimilars only make about 6% of global biologics chains. And biologics stem cells are expected to more than double in the next 7 years, far outpacing small molecules.

We are excited, we are very excited by our start with some big notable successes as we have entered this biosimilar market.

The #2 in biosimilar market share for our oncology biosimilars in USA. We are market leader for trastuzumab in Australia and Canada, where we happen to be the first to enter the market. As we start '21, we are also excited to bring the first biosimilar to Humira in Japan and be a part of the first wave of the launch in Canada. Very soon, we'll be looking forward to launch our biosimilar to the Avastin as well as first biosimilar to the NovoLog in developed markets.

We have always said that we see this business as a global, truly global franchise, started long back with the Herceptin launch in India, but slowly and steadily have build upon that. With the strength of regulatory approval and the launches around the globe, with a rapid growth in the past few years.

More than just individual approvals, we are excited to have a biosimilar franchise, commercial -- now that the commercial scale that legacy Upjohn brings to further expand our reach and drive the biosimilar uptakes in this market.

While we are optimistic for the future, we won't shy away from the fact that we had, had certain hiccups, which is not very surprising when you are trying to create a new market. Importantly, as we evolve, we are taking these learnings into our forward-looking plan. We have learned quickly the importance of entering each biosimilar market with the right product at the right time at the right cost and with enough supply. In our early launches, we had some hiccups. We were late to market in some cases. We missed the tender cycles in some markets. We also underestimated how the innovators would slow down or would compete aggressively and slow down the biosimilar uptake.

We have also taken away some positives here. We have a great group of R&D partners. We have quickly developed a global presence. And we did really well in some tender markets and many other markets where we were the first.

We take all of this forward and are *committed to our next steps to leverage, not only in science, but our commercial capabilities to get the most out of this franchise*. That commitment includes quickly ramping up the investments in our

commercial capabilities wherever necessary, in certain markets, if there is opportunity to expand the access, drive uptake and help the market realize those cost savings.

We also *continue to remain committed to invest in the biosimilar development programs.* And Walt will talk in a lot of detail about our biosimilar pipeline, where we are with the pipeline, with the development programs. But I would just like to highlight that we will be *extremely focused on our efforts to be the first to the market and believe we are well positioned for several of our key programs in the future.*

Viatris is *committed from scientific as well as from the commercial capabilities and know how to be a long-term leader in this space.*

144.    When Barclays analyst Balaji Prasad asked about the current and future performance of bio-

similars given one of Viatris's competitors "signaling exit from the biosimilar strategy indicating that

this is not as attractive as it was thought two years ago or one year ago," Goettler and Malik dismissed

that idea, making clear that Viatris not only had no intention to exit biosimilars, but had affirmatively

decided to commit to biosimilars for the long-term, stating, in relevant part, as follows:

Prasad:        So -- yes, a couple of questions from me. Firstly, on the biosimilars front. Can you tell us if you have enough pipeline currently now with the second and third wave portfolio of biosimilars, and you need to augment this with newer partnerships? Also, if you can help us call out the ROCI you generate on biosimilars today and directionally, where could this move to? I'm asking this in particular context with one of your competitors signaling exit from the biosimilar strategy indicating that this is not as attractive as it was thought 2 years ago or 1 year ago. So what could also we do in terms of change in game plan? And I have a couple of other questions.

Goettler:      Thanks, Balaji, and let me just summarize. *We have no intention to get out of biosimilars, quite the opposite.* But let me have Rajiv get more into details on that.

Malik:         Thanks, Balaji, and thanks, Michael. Balaji, we today try to show you a little bit about what not we have only achieved, but more importantly, what's. in the pipeline. And we're excited, as we already disclosed with the projects like looking into the biosimilar to Avastin, looking to the biosimilar of NovoLog, EYLEA, biosimilar to Humira, biosimilar to Perjeta, Toujeo, BOTOX, I can go on.

And as we're talking about this, you would expect us that Walt talked about certain targets, and that's where exactly where we are wider near the program, finalizing the diligence around that. And we will continue

63

to go both ways. We will keep on looking for the partnerships, and we'll keep on building our own competencies.

So it's an area for us where we have said this is a global franchise. *This is an area where we have decided to hang in, not get out. And for us, it's a long-term play,* and we *continue to make the R&D investments, as well as investments in our commercial infrastructure. Because we are very excited what we see ahead in this growing space. So that's my two cents view on the biosimilars.*

145.  Later, Anthony Mauro, Viatris's President of Developed Markets, echoed this sentiment by explaining that biosimilars was central to "focused growth" in Viatris's important Developed Markets segment, one of the three building blocks for success in that segment, stating, in relevant part, as follows:

I'm looking forward to talking to you this morning about our Developed Markets segment.

As you've heard, this segment includes our businesses in North America and in Europe and contribute significantly to Viatris' revenue. I plan to walk you through the businesses in these 2 regions and talk to you a little bit about the road map for success.

Road map is center[ed] around 3 main building blocks. First, sustainable stability. We expect to see our historical low to mid-single-digit erosion continue. This will be driven primarily by LOEs, but also will be offset by new launches and volume growth in this segment.

The second building block on this road map is focused growth. I will talk to you about our focus on highly profitable, highly complex products. *You will see our global business and biosimilars continue to be a long-term investment strategy.* And we project growth in this franchise in both developed market regions on a year-over-year basis. In addition, we are focusing efforts on products like Yupelri in North America, as well as on products from our newly acquired business from Aspen in Europe.

146.  The statements set forth in paragraphs 143 to 145 above were false and misleading when made. It was misleading for Defendants to state that Viatris had "no intention to get out of biosimilars" and viewed biosimilars to be a "core part of our forward looking Viatris portfolio" without disclosing that Viatris was conducting a "thorough strategic review" in which Defendants were actively and seriously considering whether biosimilars was a "core" or "noncore" part of the business. In fact,

the strategic review ultimately resulted in the Company's determination that biosimilars was not a core part of the business and the divestment of that business.

**B. Barclays Global Healthcare Conference**

147.  On <u>March 10, 2021</u>, Goettler and Malik, along with other Viatris executives, presented to analysts and investors at the Barclays Global Healthcare Conference, during which Defendants made false and misleading statements about Viatris's business model and strategy and its commitment to biosimilars.

148.  Barclays analyst Balaji Prasad began the event by asking Goettler to address the growth outlook for the Company, to which Goettler responded, in relevant part, as follows:

> Prasad:    Great. So we've had a couple of interactions recently. You had your guidance call, and then you have the detailed Investor Day, lots of useful information. So coming fresh off these, I want to focus our discussions on what investors have been asking about regarding the outlook for the company.
>
> I think the stock has been down around 25% since the guidance was presented, and a fair bit of investor frustration has been that there was no quantifiable guidance beyond 2021. And while the global growth platform and the global gateway that you articulated so well is something intuitively graspable, market probably needed some directions from you on what it means for growth. So could you maybe start there and we could take one of the next questions?
>
> Goettler:    Thanks, Balaji. Thanks for the question, and thanks, everybody, for joining us today. Balaji, what I would say, look, Viatris came into being a little bit more than 100 days ago, November 16, right? And as we got together, we said exactly what we said we're going to do, is we're going to get the 2 companies together, get immediately started on understanding the business, have the new manager understand each part of the business, build a bottom-up budget of quality, and then that's accumulated in February in our guidance. And as I said, we guided with a midpoint of 6.2 for EBITDA. That is our base, right? That's guidance that takes all the puts and takes into account that we see in the business and that we think is the right starting point for us as part of the interest.
>
> Now what you also have to appreciate, what this is, ***all the strategic tenants that we've been talking about for 2 years now, almost, right, are in place***. This is a business that is ***transformative and global scale,*** right? …

The same for the *product portfolio. It's diverse. It's differentiated.* There's opportunities there. …

…So we, as management, very, very focused on executing against the plan we have.

Going forward, we see lots of opportunities, but we didn't have the time with 100 days to do a quality, quantitative bottom-up budgeting. That will come later in the year. And at that time, we will follow up.

149. Later, Prasad asked about Viatris's "partnered approach" to the biosimilars business, to which Malik responded, in relevant part, as follows:

Prasad:    All right. Great. That's helpful. So maybe shifting to the business side of the discussion. Biosimilars, I mean, that's part of the business that I've always been very excited about. I like the platform and the broad [step] of the pipeline that you, Mylan, historically had and Viatris has. So I get it when you speak to the global gateway, but why not take on unpartnered approach, especially (inaudible) being so massive and you're bullish on it. And why don't you go on it on your own instead of having like 5 or 6 partners for your 15, 16 products?

Malik:    Yes. So Balaji, it's a great question. And as you know, we -- *it's a strategic area for us.* And *if it's a strategic area, we will be looking forward to build the core competencies, which we have been working on. And our first core competency, which we have been building upon, has been in our science side, R&D side, regulatory, medical affairs, which we have been building up.*

Now still partnership continues to be a sort of -- for us, it has worked very well. These are deep partnerships. These are not one-off products. Our partnership with Biocon is more of a strategic sort of relationship, and I think we have done pretty well in executing that. Of course, the FKB one is -- which is one around the biosimilar (inaudible) full year is one of -- where it's one product opportunity. But I tell you that there's enough capacity available, as you know, from the manufacturing point of view. So building our own -- allocating our own CapEx to build that today perhaps is not the smartest way to allocate our capital when we have very -- many other priorities very well defined. *But you can be rest assured, because if this is a strategic area for us, we will be building those components as we go along, starting with the science and, more importantly, what we need to enhance and build on our commercial site. And what are those areas so that we can get more out of this platform?*

150.  Prasad followed up by asking about how potentially growing competition in the biosimilars market would impact Viatris:

> **Prasad:**    And Rajiv, maybe just on the question of biosimilars. Can you help us understand how should -- how we need to think about competition in the space? There are not too many players globally who would want to be global biosimilar players, right, who are -- were in that capacity. And I can also see the advantage partners having partners from other economies or geographies (inaudible). And Sandoz just came out recently, an hour ago maybe, saying that they expect biosimilars to be a major growth engine for them globally. And what would competition entail for you? And is it going to be where you vastly talk on losing economics as it happened in the generic side? Or is this going to be much more impact to opportunity?

> Malik:    I think we always said that *biosimilar for us is not a U.S.-specific business or a market-specific business. For us, it's a global franchise.* And we – I gave in my Investor Day, I gave example of one Herceptin biosimilar being launched from one country and today being in 65 countries.
>
> And you're so right, there is no global competition. Yes, Sandoz is now shaping up as a global sort of competitor, but many of these markets, especially the emerging markets, there are -- this is something which you can't play much locally. Now, of course, there is a competition coming in from some of the Indian biosimilar players, which we will have that, but I think we have the advantage that -- from our partners point of view, that we have the infrastructure to take it to the -- any part of the world, right from the China to the Latin America, to the Africa. So that's the advantage of partnering with somebody like us.
>
> And I'll tell you, our commercial infrastructure in these markets enables us to get more of this platform in -- just starting with what we have – already what we have. *And we see that this will continue to be one of the key growth drivers as we launch more and more of these products in more geographies.*

151.  The statements set forth in paragraphs 148 to 150 above were false and misleading when made, because (i) it was misleading for Goettler to state that "all the strategic tenets that we've been talking about for two years now almost, right, are in place," without disclosing that Viatris was conducting a "thorough strategic review" in which Defendants were actively and seriously considering Viatris's business model and strategy; (b) it also misleading to make that statement without disclosing

that Defendants did not know whether "all the strategic tenets" were "now almost…in place" and would not know until Viatris finished its "thorough strategic review; and (c) it was misleading for Malik to state that biosimilars was a "strategic area for us" and would "continue to be one of the key growth drivers" without disclosing that Viatris was conducting a "thorough strategic review" in which Defendants were actively and seriously considering whether biosimilars was a "core" or "noncore" part of the business. In fact, the strategic review ultimately resulted in the Company's determination that biosimilars was not a core part of the business and the divestment of biosimilars, ensuring that it would not be the key growth driver for the Company.

152.  During the same conference, Goettler also made a false and misleading statement about Viatris's growth strategy, outlook, and potential in response to a question from Prasad about whether Viatris would experience growth before 2024, stating, in relevant part, as follows:

> Prasad:    I want to again call into your attention another slide that you presented on road map to total shareholder return. That's again another question that I was getting. So you had Horizon 1 going up to 2023. And Horizon 2 that you defined as a phase of durable growth. And again, many of the interpretations has been -- a couple of questions I got was, does this mean that there is no growth until 2024? So even though we cannot probably call out quantifiable way, directionally, does this mean that we'll only see growth from Horizon 2 onwards or 2024 onwards? Is that the right message?

> Goettler:    Well, I think what we consistently said is that the focus is on -- in the first 3 years is on rebalancing and delevering. That's where our priorities lie. *We also very consistently said that we see 2021 as a trough year. Now trough year clearly means it's not going to go lower than this, right?* And we say trough year, that's for revenue. That's for EBITDA. And it's more certainly for cash flow, right? For cash flow, you can clearly see -- you don't need to believe in anything else to see that the cash flow will grow as the onetime costs kind of start diminishing.

> We see opportunities. But again, to give you quantitative guidance of the percentages, on top line percentages, on bottom line, how much exactly it is, we want to do a quality bottom-up work before we put those numbers out.

153. The statement set forth in paragraph 152 above was false and misleading when made. It was misleading for Goettler to state that 2021 was "a trough year" and that in future years, Viatris's revenue, adjusted EBITDA, and free cash flow would not "go lower" than the Company's guidance for 2021 without disclosing that Viatris was conducting a "thorough strategic review" in which Defendants were actively and seriously considering whether parts of the business were "core" or "noncore." In fact, as Defendants later revealed, the result of the strategic review was the Company's divestment of its biosimilars business after determining that it was not a core part of the business, which, coupled with other planned divestitures, Defendants admitted would result in an estimated pro forma adjusted EBITDA of $5 to $5.6 billion in 2022, well below the 2021 financial guidance. *See* ¶¶ 112, 124.

## C. First Quarter Earnings Call

154. On <u>May 10, 2021</u>, Viatris announced its financial results for the first quarter of 2021. In a conference call that Viatris held that day to discuss the results, Goettler made false and misleading statements about Viatris's growth strategy, outlook, and potential.

155. In his opening remarks, Goettler announced that Viatris was reaffirming its full-year financial guidance for 2021, and reiterated that 2021 is the "trough year," which he defined as the midpoint of our guidance of USD 6.2 billion adjusted EBITDA, stating, in relevant part, as follows:

> Back when we launched Viatris in November 2020, our vision was to build a new kind of health care company, differentiated by a global operating platform with significant scale, and commercial capabilities and expertise across science, manufacturing, legal and IP. A broad, diverse product portfolio that includes brands, complex generics and biosimilars and generics, and is agnostic to therapeutic categories, dosage forms and delivery mechanisms, and a strong R&D platform that is well positioned to deliver a broad pipeline of complex novel products, including late-stage biosimilar programs.

> Our strong first quarter results validate the success of a diversified and robust business that can absorb headwinds in any individual part of the business while seizing market opportunities where and when they present themselves. In the first quarter, we reported net sales of USD 4.4 billion, adjusted EBITDA of USD 1.6 billion and free cash flow of USD 799 million, which were above our original expectations. These results reflect the strength of our business and were also partially helped by favorable timing of some revenue and expenses and by favorable FX.

…This quarter, we generated USD 163 million in new product revenue to partially offset inherent product erosion, and we're on track to achieve USD 690 million in new product revenue for the full year. *We're continuing to shift to more differentiated and sustainable portfolio with strong growth in complex generics and biosimilars and growth of our recently acquired thrombosis franchise in Europe.*

In closing, we're proud to report a very strong and high-quality first quarter. We're seeing underlying strength in our business and we are reaffirming our full year financial guidance for 2021, which incorporates the known potential headwinds and tailwinds for the remainder of the year. At the conclusion of the second quarter, we will be reassessing whether to update guidance for the full year. And while we're not giving long-term guidance at this time, *we continue to feel strongly that 2021 is our trough year as defined by the midpoint of our guidance of USD 6.2 billion adjusted EBITDA. And we believe that, that $6.2 billion is a true floor of our business, not just for this year but also for future years.*

156.  Responding to a question from Bank of America analyst Jason Gerberry about the role of Viatris's existing pipeline for its performance, Goettler stated, in relevant part, as follows:

|  |  |
|---|---|
| Gerberry: | So just one follow-up is should investors look at this year's revenue as a trough as well? I know that's one question that -- because revenue was omitted. And then on pipeline for 1Q, there's the callout on Thrombosis. So just wondering about sort of the more true pipeline versus M&A new product. And from like the truer pipeline products baked in the guidance, how comfortable are you that you're through the regulatory legal gating factors to really deliver on the full year new product revenue guidance? |
| Goettler: | Okay. Thanks, Jason. Look, what we said is, again, we're not giving guidance at this point. *But the 6.2[] as a floor, we're highly, highly confident in because we know all the levers that we can have. We know the robustness of our business and our EBITDA you can put any leverage.* Free cash flow, high confidence again because *we clearly see the growth coming driven by EBITDA* and lower one-time costs. On revenue, we've got a good understanding of the base erosion that we have in the business. *We have a good understanding of the new pipeline revenue we can bring.* …. |

157.  Goettler concluded by reiterated that Viatris's first quarter results validated the strength of the "diversified and robust business model" that that Defendants remained confident that 2021 is our "trough year" and that $6.2 billion in EBITDA was the Company's "floor going forward," stating, in relevant part, as follows:

Let me just summarize. You've seen our first quarter results. They're very strong. We're very confident, proud of them, and they *validate the strength of the diversified and robust business model that we have and that differentiates us as a company.* You've seen us meeting our financial commitments. We're going to continue to do that, including declaring a dividend, paying down our debt and on track to deliver on our synergies. We are reaffirming our full year 2021 guidance. And as we said, after the end of Q2, we're going to look at that again and reassess whether we would update that guidance.

*We continue to remain confident that '21 is our trough year. And we gave a definition of that. The definition is $6.2 billion in EBITDA as our floor going forward.* And with that, I want to thank you for all the questions and look forward to continue discussion. Thank you.

158. The statements set forth in paragraphs 155 to 157 above were false and misleading when made, because (a) it was misleading for Goettler to state that they were "confident that 2021 is our trough year" and that "$6.2 billion in EBITDA" was Viatris's "floor going forward" without disclosing that Viatris was conducting a "thorough strategic review" in which Defendants were actively and seriously considering whether parts of the business were "core" or "noncore," and thus lacked sufficient information to know whether the Company's future adjusted EBITDA would fall above or below $6.2 billion; (b) it was misleading for Goettler to state that "we know all the levers that we can have" and "[w]e know the robustness of our business" without disclosing that Viatris was conducting a "thorough strategic review" in which Defendants were actively and seriously considering the Company's business model and strategy, as well as whether parts of the business were "core" or "noncore," and thus did not know "all the levers that we can have" or the "robustness of our business." In fact, as Defendants later revealed, the result of the strategic review was the Company's divestment of its biosimilars business after determining that it was not a core part of the business, which, coupled with other planned divestitures, Defendants admitted would result in an estimated pro forma adjusted EBITDA of $5 to $5.6 billion in 2022, well below the 2021 financial guidance. *See* ¶¶ 112, 124.

**D. RBC Capital Markets Healthcare Conference**

159.  On <u>May 18, 2021</u>, Goettler and Narula presented and spoke with analysts and investors at the RBC Capital Markets Healthcare Conference, during which Goettler made false and misleading statements about Viatris's business model and strategy to leverage its broad and diverse portfolio spanning all categories of pharmaceutical products, including brand-name drugs, generics, complex generics, and biosimilars.

160.  In his opening remarks, Goettler repeated his statement from the May 10, 2021 conference call that the first quarter results "validated" Viatris's business model, stating, in relevant part, as follows:

> Viatris as a combined company, is still a relatively new company, formed a little bit less than 6 months ago, in November. *And the vision we had was to create a new kind of health care company, one that's differentiated by a truly global operating platform, one that has scale.* It has commercial capabilities and has expertise in science, in manufacturing and legal and IP; secondly, *one that has a broad and diversified product portfolio. It's very important to us across brands, complex generics and biosimilars and generics and, very importantly, one that's agnostic to any particular therapeutic area, dosage form delivery mechanism*, et cetera; and thirdly, *one that has a strong R&D platform that's well positioned to deliver a broad pipeline of complex and novel product, including our late-stage biosimilar pipeline.*
>
> So just a few days ago, we were able to report the results of our first full quarter, and I'm happy to say it was a very strong and high quality quarter for us. And we believe that those results *validate the success of that diversified and robust business model that I just explained,* one that can absorb headwinds in any particular part of the world while seizing on opportunities when and where they present themselves. *And our results this quarter, we believe, reflect that*

161.  The statements set forth in paragraph 160 above were false and misleading when made. It was misleading for Goettler to state that Viatris's vison was to create a company with "a broad and diversified product portfolio" spanning "across brands, complex generics, biosimilars, and generics," and that "very importantly," their business model was "agnostic to any particular therapeutic area, dosage form, delivery mechanism," without disclosing that that Viatris was conducting a "thorough strategic review" in which Defendants were actively and seriously considering whether to commit to

a business model and strategy based on a broad and diversified product portfolio that was "agnostic to any particular therapeutic area, dosage form, delivery mechanism." As Defendants later admitted, that strategic review included a "thorough analysis" the Company's "current strengths and capabilities," among other things, which led to "clear results" that "some therapeutic areas had too much competition or too much scientific risk for us to see a credible path to leadership in the time horizon that we're looking at," "others were too small or didn't provide enough room for innovation," and that three therapy areas, ophthalmology, dermatology and gastrointestinal, "particularly hit the sweet spot for us." *See* ¶ 113. It was also misleading for Goettler to state that Viatris's "vision" included its "strong R&D platform that's well positioned to deliver a broad pipeline of complex and novel products, including our late-stage biosimilar pipeline," without disclosing that Viatris was conducting a "thorough strategic review" in which Defendants were actively and seriously considering whether biosimilars was a "core" or "noncore" part of the business. In fact, the strategic review ultimately resulted in the Company's determination that biosimilars was not a core part of the business and the divestment of biosimilars, ensuring that it would not be the key growth driver for the Company. Further, it was misleading for Goettler to state that Viatris's quarterly results for the first quarter of 2021 "validate the success of that diversified and robust business model" without disclosing that Viatris was conducting a "thorough strategic review" in which Defendants were actively and seriously considering that diversified and robust business model and thus either knew that Viatris would not commit to that business model or did not yet know whether Viatris would do so.

162.  During the same conference, responding to a question from RBC Capital Markets analyst Daniel Busby about "the factors that give you confidence" to say that "2021 could be a trough year for the company," Goettler made the following additional false and misleading statements, stating, in relevant part, as follows:

> Busby:    We get a lot of questions around financial outlook for Viatris and the
>           company's longer-term growth profile. So a 2-part question here. One,

you said a number of times that you expect 2021 could be a trough year for the company. Can you talk about the factors that give you confidence to say that?...

Goettler:    Yes. Thank you, Dan. So let me back up and talk about the trough year question and kind of the outlook for the business first. ….

No, we're not giving long-term guidance. We're very clear about that. We're committed to giving some color on that towards the end of the year. But what we did always say is *this trough year term, that '21, we see that as a trough year. And we also get a lot of question on what that means. So at the earnings, we actually defined what that means by saying, we have a midpoint of our adjusted EBITDA guidance for the year, that's $6.2 billion. And then we believe that, that $6.2 billion is the floor for our business going forward. So that's about as hard as a line as you can draw at this point*. And we're confident in that for a number of reasons.

Number one is *we know the robust business model that we have*. Now that's *balanced, that's diversified*. We can *absorb the head-winds and tailwinds*. So we have high confidence in that, and again, our first quarter results reflect that. We understand the *base business that we have and the natural erosion that we have in that base business. We understand what our pipeline can deliver*.

So that gives us a good feeling, and that's just top line. So from there, you go down, and you know *all the levers that we have to go between revenue and EBITDA. So it gives us high confidence to be able to make that statement of $6.2 billion being the floor for the business going forward*.

…For longer-term targets, and to give you some color on that, we need to do the internal*. Our business model is very different from, let's say, brand pharma, where you have relatively limited portfolio that you focus on and gets centrally driven and then you're kind of looking for the country where you can sell it. Our model is very different*. We have 1,400 molecules, and we tailor that portfolio to the individual market. We tailor our R&D to the demand and what we think is right for the market. *So it requires a bottom-up work. That bottom-up work takes time. And we just started that strat plan, what we call strat plan process, and we'll get back to you towards the end of the year with a bit more color on that*.

163.  The statements set forth in paragraph 162 above were false and misleading when made. It was misleading for Goettler to state that $6.2 billion in adjusted EBITDA would be the Company's "floor going forward" and that this was "as hard as a line as you can draw at this point" without

disclosing that that Viatris was conducting a "thorough strategic review" in which Defendants were actively and seriously considering the Company's business model and strategy, including whether parts of the business were "core" or "noncore," and thus lacked information necessary to know whether Viatris's adjusted EBITDA in future years would be above $6.2 billion. In fact, the thorough strategic review resulted in Viatris determining that biosimilars and other assets were not "core" parts of the business and should be divested, which Defendants admitted would lead to an estimated pro forma adjusted EBITDA of $5 to $5.6 billion for 2022. *See* ¶¶ 112, 124. It was also misleading for Goettler to state that the reasons for Defendants' confidence in $6.2 billion in adjusted EBITDA being the "floor of our business" included their knowledge of Viatris's "robust business model" that is "balanced," "diversified," and that "can absorb the headwinds and tailwinds," without disclosing that Viatris was conducting a "thorough strategic review" in which Defendants were actively and seriously considering the Company's business model and strategy, including whether to maintain a diversified portfolio, and thus lacked information necessary to know whether Viatris's business model would be diversified and would absorb "headwinds and tailwinds." It was also misleading for Goettler to state that Viatris's "business model is very different from, let's say, brand pharma, where you have relatively limited portfolio that you focus on" without disclosing that Viatris was conducting a "thorough strategic review" in which Defendants were actively and seriously considering the Company's business model and thus had not committed to a business model that was "very different" from brand pharma. In fact, that thorough strategic review resulted in Viatris announcing a reshaped business model that was similar to a model focused on a limited portfolio of innovative products such as NCEs and 505(b)(2)s in three "focused therapeutic areas": ophthalmology, gastrointestinal, and dermatology. It was also misleading for Goettler to state that Viatris was just starting its "bottom-up" work for its "strat plan process" without disclosing that Viatris's was not conducting strategic planning for its announced "business model," but was in fact conducting an "extensive," "comprehensive," and

"thorough strategic review of our entire business" that would involve determining to determine "what was core and what was noncore to the future of our company."

**E. Goldman Sachs Global Healthcare Conference**

164.  On June 10, 2021, Goettler, Narula, and Malik presented to and spoke with investors and analysts at the Goldman Sachs Global Healthcare Conference, during which Defendants made the false and misleading statements about Viatris's business model and strategy and its commitment to biosimilars.

165.  In his opening remarks, Goettler reiterated his previous statements that Viatris's first quarter results "validated" its "diversified robust business model that differentiates us as a company," stating, in relevant part, as follows:

> When we launched Viatris in November, we had the vision really to create a new kind of health care company, one that's differentiated, that's differentiated by having a truly global operating platform that has significant scale. We have commercial capabilities now across all geographies around the world, expertise in science, manufacturing, legal, IP. So that's one.
>
> On the portfolio side, we have *a broad and diverse product portfolio, that includes brands, that includes generics, that includes complex generics and biosimilars. That portfolio is synergistic, but it's agnostic to any particular therapeutic area, dosage form or delivery mechanisms, right? So that diversity gives us stability, allows us to balance any kind of negative impact in any particular part of the business, but jumping on opportunities as we see them.*
>
> A strong R&D platform that is proven, well positioned to deliver *a broad pipeline of complex and novel products, including our late-stage biosimilars* and we have over 10 biosimilars in development in oncology, ophthalmology, immunology, diabetes and others.…
>
> *So that's what we've built, right?* And then very recently, we published our first full quarter, quarter 1 results, and we saw really underlying strengths to our business. *And importantly, I think that strength of our results starts to validate that diversified robust business model that differentiates us as a company.*

166.  Narula later responded to a question from Goldman Sachs analyst Nathan Rich to address factors driving revenue, namely Viatris's pipeline and new product revenue, and how that pipeline

breaks down between brands, generics and complex products and biosimilars," stating, in relevant part, as follows:

Rich:    Great. Can you -- I wanted to kind of move to the -- I think, 2 factors that are important to revenue. So first being base business erosion. You've said 3% to 4%. And Michael, you said earlier that you feel like you have pretty good line of sight on this, it should be in that range year-to-year.

So maybe starting with that, and then I want to transition over to the pipeline and new product revenue. But with the base business erosion, can you maybe talk about the components of that? Why you feel comfortable that 3% to 4% is the right number? And how that maybe breaks down across the different businesses that you have when we think about brands, generics and complex products and biosimilars?

Narula:    Yes. Thanks, Michael. Before we, Nate, go there, I'd break it up by -- I think you need to understand and appreciate what is driving that. And one is this, the resilience. 60% of this is brands, 30% is generics and 10% is complex and biosimilars today. *And it's moving more towards the complex and biosimilars.*

Now in the 60% branch, it's made up of 3 type of brands. We talked about growth brands, which is exclusive brands like Yupelri, which are growing. There are more than $1 billion of established brands like Creon, (inaudible), Influvac, which is, again, not declining business, which is a modest growth business.

And then the third bucket is LOEs where after we have seen the major LOEs, there is some degree of erosion, continued erosion over there on some of those brands because they're different from established brands in terms of the complexity and the competitive landscape.

And then there is a generic bucket. So generic bucket, we said…3% to 4% erosion.

Now *pocket of biosimilars is growing. As you saw, Q1 was 27% growth in that bucket of complex and biosimilars. That's very much all the biosimilar growth, 27% worth of biosimilars growth.*

So I think these are -- there's no product. There's no one geography. There's multiple factors. It's highly complex. But I can assure you that we have our fingers on this pulse of this highly complex business, and we are managing it very proactively.

167. In response to a question from Rich about the breadth of Viatris's pipeline relative to its peers "across the different areas," including biosimilars, to which Malik responded, in relevant part, as follows:

Rich:    That's really interesting. It kind of dovetails into the next topic I wanted to touch on was just the breadth of the pipeline. Because I think kind of relative to the peers that we've typically looked at a much broader pipeline than anyone else has. Could you maybe help us think about across the different areas, biosimilars, complex products, inject-ables, sort of the relative sizes of the opportunities and maybe what you're most excited about in terms of coming to market over the next several years?

Malik:    A lot of opportunities in this pipeline. ***And over a period of time, it is moving from value chain perspective. Today, almost 75% of our portfolio is around complex and biosimilars.*** We are not mov-ing away from generics, but we have been smart about that. We have been diligent about that, that how we pick our spots and compete in that.

So when it comes to the biosimilars, I think next couple of years, will be an opportunity like -- and I'm excited by EYLEA. I think we are still – because as you've seen by this time, not in U.S.A., everywhere else also, ***the first to market is becoming a decisive advantage. And that's where our – we want to focus on, how can we be the first to the market.*** And EYLEA is -- we just had a successful readout of our Phase III. We are in very much as we have said that we'll be filing this we are able -- within this year. We remain on track. That's one.

BOTOX is very exciting for us because, ***again, we are leading the pack over here***, having good engagement with the FDA. FDA is ex-cited that there are some restocking about bringing another biosimilar over here. So I think that's building up.

168. The statements set forth in paragraphs 165 to 167 above were false and misleading when made. It was misleading for Goettler to state that Viatris' business model was based on its "broad and diverse product portfolio" that includes brands, generics, and biosimilars, and which is "agnostic to any particular therapeutic area" or "delivery mechanisms" without disclosing that Viatris was conduct-ing a "thorough strategic review" in which Defendants were actively and seriously considering whether to commit to a business model and strategy based on a broad and diversified product portfolio that

was "agnostic to any particular therapeutic area, dosage form, delivery mechanism." As Defendants later admitted, that strategic review included a "thorough analysis" the Company's "current strengths and capabilities," among other things, which led to "clear results" that "some therapeutic areas had too much competition or too much scientific risk for us to see a credible path to leadership in the time horizon that we're looking at," "others were too small or didn't provide enough room for innovation," and that three therapy areas, ophthalmology, dermatology and gastrointestinal, "particularly hit the sweet spot for us." *See* ¶ 113. It was also misleading for Goettler to state that Viatris' diversity in its product portfolio "gives us stability" and "[a]llows us to balance any kind of negative impacts in any particular part of the business" without disclosing that Viatris was conducting a "thorough strategic review" in which Defendants were actively and seriously considering whether to commit to a broad and diverse product portfolio, which included determining whether parts of the business were "core" or "noncore," and thus Defendants did not know that its product portfolio would provide stability or would balance other negative impacts in any other part of the business. Further, it was misleading for Goettler to state that Viatris's quarterly results for the first quarter of 2021 "validate the success of that diversified and robust business model" without disclosing that Viatris was conducting a "thorough strategic review" in which Defendants were actively and seriously considering that diversified and robust business model and thus either knew that Viatris would not commit to that business model or did not yet know whether Viatris would do so.

169. During the same conference, Goettler also made false and misleading statement about Viatris's growth outlook and potential. In response to a question from Rich about the "key priorities for the business" in Phase I of the Strategic Roadmap that would put the company on a path to "long-term revenue and EBITDA growth" in Phase II of the Strategic Roadmap, Goettler stated, in relevant part, as follows:

Rich:          Great. I think at the Analyst Day, if I go back, you broke the road map down into essentially 2 sections, now kind of through 2023 and then 2024 and beyond. I guess maybe to kind of tie your comments to-gether, kind of what do you feel like are the key priorities for the busi-ness in this first kind of 3-year period that you want to see that would put the company on a path to achieve long-term revenue and EBITDA growth in that 2024 and beyond period?

Goettler:     Yes. Thank you, Nate. And look, what we said at the Analyst Day, we still see that. Absolutely we executed against that. That we see this as a kind of a 2-horizon kind of strategy, where you have the first horizon, maybe around 3 years and the second horizon.

                    In that first horizon, our priority clearly is on delevering and rebalanc-ing that business that we have, right? We really have great building blocks to build to it. ***But putting it all together, that means we see 2021 as our trough year. We consistently said that. We recently defined what that means to be a trough year. That means the midpoint of our guidance of $6.2 billion being the floor of our business going forward…..***

170.  Rich followed up by asking about the "key swing factors" that investors should have in mind when they think about their model, both on the positive and headwind front that will determine kind of their growth in 2022 and 2023." To which Goettler stated, in relevant part, as follows:

Rich:          And you've given a lot of detail on 2021 and the moving pieces on both top line and EBITDA. I guess as we think about going from this trough this year to beyond that, starting next year, what do you feel like are the key swing factors that investors should have in mind when they think about their model, both on the positive and headwind front that will determine kind of their growth in 2022 and 2023?

Goettler:     Yes. So we're not giving long-term guidance, ***as you know, we kind of defined the floor. We're going through our strategic plan pro-cess. We'll let that play out, and we're committed to giving a bit more color at the end of the year.***

                    ***But what gives us confidence in the 6.2 number is that we under-stand what these headwinds and tailwinds really are. We know what's at our disposal.*** … But let me just walk through kind of of if you look at the revenue, right, you have to realize that we have a ***much more diversified revenue base, right? And that helps us to absorb any kind of headwinds that we signed in any particular part of the business.***

                    We do understand very well what our base business erosion is….

> *We also understand what our pipeline can contribute, right?* You take all of that together, and then we have the potential for revenue synergies.
>
> None of that baked into any numbers, but the potential is clearly there. So that gives you kind of the revenues….
>
> Then gross margin, we're very, very disciplined about how we rationalize our portfolio. … *We typically have multiple levers, right, to continue to deliver, have confidence in that $6.2 billion adjusted EBITDA as a floor. And then again, later in the year, we'll get more color on that.*

171. The statements set forth in paragraphs 169 and 170 above were false and misleading when made. It was misleading for Goettler to state that "what gives us confidence in the 6.2 number is that we understand what these headwinds and tailwinds really are," "[w]e know what's at our disposal," and "[w]e also understand what our pipeline can contribute," without disclosing Viatris was conducting a "thorough strategic review" in which Defendants were actively and seriously considering whether parts of the business were "core" or "noncore," and thus, Defendants did not yet know what assets the Company had, including its pipeline, to be confident that the Company's revenue, EBITDA, and cash flow would improve from 2021 results. In fact, as Defendants later revealed, the result of the strategic review was the Company's divestment of its biosimilars business after determining that it was not a core part of the business, which, coupled with other planned divestitures, Defendants admitted would result in an estimated pro forma adjusted EBITDA of $5 to $5.6 billion in 2022, well below the 2021 financial guidance. *See* ¶¶ 112, 124.

### F.  Second Quarter Press Release and Earnings Call

172. On <u>August 9, 2021</u>, Viatris announced its financial results for the second quarter of 2021. In a conference call with analysts that day, Goettler, Malik, and Narula presented to and spoke with analysts and investors, during which Defendants made false and misleading statements about Viatris's growth strategy, outlook, and potential, and the Company's commitment to biosimilars.

173.  In his opening remarks, Goettler stated that Viatris "generated $224 million in new product revenue and we continue to be on track for $690 million in new product revenue for the full year" and "paid down $1.15 billion in debt year-to-date," adding that "[t]his high level of performance enables us to continue to deliver on our commitments" and that "we are well on track to achieve $6.5 billion in debt repayment by 2023." Goettler continued by saying: "on last earnings call, I stated that we see *$6.2 billion in adjusted EBITDA as a true floor of our business going forward and with the momentum we have, this is now clearer than ever,"* stating, in relevant part, as follows:

I'm pleased to say that the strong execution we showed in the first quarter has continued into the second quarter. We are performing at or above the upper end of our own expectations across the entire business. All 4 of our commercial segments, all 3 of our product categories, our manufacturing operations, our R&D and our enabling function and thereby laying a solid foundation for future performance.

Today's strong results… *validate the vision and the strategy we have in combining the 2 legacy organizations….*

Mylan brought Viatris portfolio diversity, a rich R&D pipeline, strong internal scientific capabilities and proven integration expertise. And Upjohn provided strong iconic brands, a global commercial engine and scale in critical markets. The result is an even stronger future-ready and resilient platform with enhanced global scale and geographic reach, *a sustainable, diverse and differentiated portfolio and pipeline*, a powerful operating platform and strong commercial capabilities with significant future potential and the power to generate strong and sustainable cash flows. And today marks the second consecutive quarter in which we have demonstrated our ability to drive the value of this combination, and we remain confident in our outlook.

But performance extends not only to our commercial segments but also to our operations…. *In July, we received a historic approval from the U.S. Food and Drug Administration for the industry's first-ever interchangeable biosimilar product in the U.S., Semglee or insulin glargine*. We're extremely proud of this achievement, which will help broaden access to this important diabetes medicine for patients, for physicians, for payers and for providers.

And as you know from what's said by FDA and policymakers throughout the government, there is significant interest in this approval and what it can mean for patients and the health care system overall, both now and in the future. The interchangeable assembly product, which will allow for substitution for the reference product at the pharmacy counter, will be introduced before the end of the year.

*Assembly is not the only advancement in our pipeline this quarter. With regard to our biosimilar and complex products pipeline, we're making steady progress*

*across multiple programs,* which Rajiv will discuss in more detail. Overall, we generated $224 million in new product revenue, and we continue to be on track for $690 million in

*Also on last earnings call, I stated that we see $6.2 billion in adjusted EBITDA as a true floor of our business going forward. And with the momentum we have, this is now clearer than ever. We also continue to make good progress in our rigorous bottom-up strategic planning effort. By better understanding how our portfolio will evolve over the next several years and looking at all the strategic levers at our disposal,* we will be better able to serve patients, provide increased access to medicine and unlock value for our shareholders. And that work will complete towards the end of the year.

Lastly, and as I've already mentioned, I cannot emphasize enough the impressive R&D engine and scientific capabilities that we have. *As we prepare to deliver our strategic plan, you can fully expect that we will continue to add high-value assets to our pipeline and further leverage our scientific expertise and R&D platform.* …

174. Malik followed by providing more details about Viatris's segment results and pipeline pro-

gress, stating, in relevant part, as follows:

Thank you, Michael, and good morning, everyone. We had another strong quarter and are very pleased with the positive momentum across our entire business, driven by strong commercial performance, supported by excellent customer service levels, continued scientific execution of our diversified pipeline, including a historic first approval of an interchangeable biosimilar to insulin glargine….

….*We are pleased to report that our global biosimilar portfolio grew by 40% this quarter*, while our overall complex generics and biosimilars category declined by 8% year-over-year, mainly due to anticipated competition on certain products in our complex generics portfolio.

Our global generics business grew by 8% year-over-year and performed better than our expectations. We delivered $224 million for new launches

in the second quarter. And as we look ahead, we remain on track to meet our $690 million target in 2021*. We believe that the diversity of our portfolio and commercial reach positions us well to balance the impact of any changes in the market and eliminate our reliance on any one product or geography. Accordingly, we expect our base business to continue to perform strongly.*

…Our Developed Markets segment grew by 2% year-over-year. … *Our biosimilars performed strongly with 47% growth this quarter, which helped offset the negative impact of the previously anticipated competition to Wixela and XULANE.* Our generics portfolio also performed better than our expectations, primarily driven by our U.S. injectables portfolio, as well as favorable COVID-related buying patterns in Europe. Having said that, *we see our biosimilars portfolio*

*driving continued growth while offsetting anticipated competition in our com-*
*plex generics space.*

…Now turning to Slide 12, which highlights our proven track record of introducing several first-to-market complex products. Breaking down barriers goes beyond best-in-class science. And right from day 1, our cross-functional team of R&D, regulatory, legal, medical, and policy experts worked diligently and collaboratively with regulators, partners and other stakeholders to seek and create pathways to clear hurdles that enable access. It can take, on average, 7 to 9 years from development to regulatory approval, given the highly complex nature of these molecules. Getting to the finish line requires tremendous perseverance, tenacity and an unwavering commitment to patients. The success stories of receiving the first approval for our Copaxone 40-milligram, Advair, Neulasta, Herceptin, Symbicort, *and most recently, the first inter-*
*changeable biosimilar to the Lantus, give us great confidence that we are well*
*positioned to deliver on our pipeline.* We intend to leverage our deep scientific capabilities to further expand access to the complex products for patients.

I will now walk you through some key pipeline updates starting on Slide 13. As it relates to our biosimilars' key pipeline, I would like to take a moment to echo Michael's remarks and applaud the efforts of so many Viatris colleagues who played a huge role in achieving this historic FDA approval of the first interchangeable biosimilar, Semglee. We look forward to launch this exciting opportunity before the end of the year.

Moving to [F Park], a pre-approval inspection from FDA of Biocon's manufacturing facility in Malaysia is now scheduled for the end of this quarter. Scientifically, we believe we are on track to achieve interchangeability for F Park which should further expand our portfolio of interchangeable insulin.

We remain on schedule for a submission in quarter 4 of this year for EYLEA. Our program for BOTOX is progressing well, and we have a meeting scheduled with the FDA in September of this year to align on our path forward.

Moving to biosimilar to Avastin. While we have no open scientific questions with the FDA, our U.S. approval has been impacted by the delay in a pre-approval inspection due to COVID travel restrictions. The same product has been approved by TGA, MHRA and several other regulators.

175. Responding to a question from Evercore analyst Umer Raffat about biosimilars, which noted

was "one of your key growth driver going forward," Goettler and Malik responded, in relevant part,

as follows:

Raffat:        Congrats on all the progress to date. I wanted to focus on one of your key growth drivers going forward, and you've mentioned an EYLEA biosimilar for -- your expectation is you could be on the market as the first to launch in 2024. If I think about the IP estate, what that basically

means is you're assuming EYLEA's composition patent on expires late
'23, plus the pediatric exclusivity, which means you basically launch
right after the composition patent plus pediatric exclusivity. How con-
fident are you that their non-composition patents won't be relevant to
your launch? And can you speak to that?

Goettler:     Okay. So … Umer, let me just back up and make maybe a general
comment here is that *EYLEA, to me, this -- the interchangeability
on Lantus, I mean, these are all proof points, I think, that we
have that our biosimilar portfolio is strong. It's going to be a
driver of growth going forward and something to be very proud
of, right?* The approval ofSemglee (inaudible) is historic. And
EYLEA, look, we're -- the number of competitors going into it, we're
leading right now. And we're the first one to finish clinical trial, and we
feel very proud about this. Rajiv, do you want to give some more de-
tails?

Malik:        Yes. Umer, thanks for your question. Umer, If I have to parse your
question when it comes to the biosimilars data, and EYLEA falls right
there, there are 3 buckets: one is science, which I think we are very
proud of and very confident of navigating it successfully. Second is
very integral to IP legal spread, which I'm so proud of that if I look
back into this biosimilar that which we never knew that when we were
5, 7 years back when we were planning, we had -- we saw this host of
patients around there because of the patient linkages. We saw -- the
whole thing was evolving around the patient [dance] and all that. When
I look into the performance, how we have performed, whether it was
insulin, whether it's Herceptin, Neulasta, Hulio, Avastin. And then
similarly, as we were doing EYLEA, our IPR is evolving simultane-
ously, approach of combining it and deploying it IPR strategy or how
to do [manage the patient term], all that is evolving, and it will continue
to evolve. But that gives us the confidence that, backed by the science
and our IP legal strategy, we'll be there to open the market in the first
phase, if not the first. We're very confident and are very bullish on this
product.

176.  Goettler and Malik then responded to a question from BMO Capital Markets Equity Re-

search analyst Gary Nachman, who asked about the interchangeability approval for Semgelee and

plans for its launch, stating, in relevant part, as follows:

Nachman:      On the interchangeability approval for Semglee, just talk about the
challenges getting that done, how difficult for other companies to po-
tentially get that interchangeability as well for insulin? So what are sort
of the barriers to entry there? That would be helpful.

And then just talk about the plans for the launch later this year. So how are you thinking about pricing dynamics and formulary acceptance and potential share capture? And how much is factored in the $690 million guidance for new products for Semglee? Is there anything meaningful in there?

Goettler:    Gary, thank you. Before I hand it over to Rajiv, let me just add a few, I would say, a little bit of color to this and what this means because this is really a historic first approval of interchangeability for any biosimilar in the U.S. And the path to that is not always a straight one. The regulatory landscape has evolved. We've evolved with it, and I think we should be so proud of what we have done as a team in enabling this and being tenacious enough to evolve with it and sticking to it and actually getting this done.

There's significant interest, as you know, from policymakers, from advocacy groups, et cetera, and what this potentially can mean for access for patients. And it's, to be honest, meaningful for me on a personal level because, 20 years ago, I led the global marketing effort for (inaudible) launch.

So I know what this product can do, how good is [a patient]. We're excited about -- specifically what this means, and we're excited what this potentially means for patients. And I want to ask Rajiv to comment on the commercial potential and the time line also that we see in rolling this out.

Malik:    Yes. And one other question was about how difficult is interchangeability, and I would say, look, Gary, ideally suited products for interchangeability of a chronically administered biosimilars where disease needs to be relatively stable and with a limited chance of rapid decline, and it's a case by case. And it does include -- the current guidance across for the biosimilars on interchangeability includes pharmacokinetic equivalence after 3 switches of test reference, test versus the reference product. So there is additional work and science involved.

Now coming back to the launch, very excited and very proud of this achievement. It's a new level with the new NDC and FDA has agreed with us a framework to transition in the interchangeable product while transitioning out the non-interchangeable. And we had agreed also in the time frame of a period of about 6 months to manage this, which aligns well with ramping up our supply of interchangeable markets.

From a commercial point of view, if anybody knows this market, this market is not just commercial, driven by the just formularies or PBMs. This is made up of Medicare Part D., the second one controlled by the PBMs. The third one, Medicaid, the government, VA hospital, corrections, cash pay and FFS. And every market channel segment has its

own dynamics and nuances, so there is no one silver bullet or one strategy to commercialize.

Our goal would be to basically drive the excess, and we believe that the substitution at the pharmacy level will help us drive that. And we see, from a timing perspective, we see some -- you will see some uptick in the market share around quarter 4, but the actual and the decent impact of interchangeability to the market share perspective and excess will be seen over the next year.

*For us, I see this as a long-term opportunity with a long tail.* And interchangeability -- and just one thing I've missed, I think, on your question around how long, we do have 12-month exclusivity for any other interchangeable product to come. So I think I've answered most of your questions.

177.  Responding to a question from Citigroup analyst Navann Ty asking for a "comment on the early impact or any qualitative comments that you can make for 2022,"Goettler stated, in relevant part, as follows:

But on the '22 question, *let me just reemphasize again what I also said in my prepared remarks is that we really see the $6.2 billion true floor for this business. I think with the performance we have under our belt now from both the first and the second quarter, it's more clear than ever to us that that's the case.*

We have really strong momentum coming from both, and that's for EBITDA. Clearly, we see cash flow growing. That's because of the continued performance and where we see EBITDA. It's from reduction in onetime costs, and Sanjeev was very clear about where we see legacy Mylan levels by the end of 2023. So you see the improvement that can come from just that factor.

178.  In his closing remarks, Goettler again reiterated that $6.2 billion in adjusted EBITDA was the "true floor of this business," stating, in relevant part, as follows:

Well, thank you for all the questions. And look, in summary, I just want to say again, we're outperforming at or above the upper end of our own expectation across the business. We feel good where we are. We're meeting our financial commitments. That includes the dividend. That includes the debt paydown. We're on track on synergies, and we're delivering very strong and sustainable free cash flow generation. I think this quarter has made that very visible. *We'll continue to make good progress on our pipeline, and Rajiv highlighted a few of those, including the historic approvals of assembly interchangeability.*

We've raised the guidance for 2021. *And I want to reiterate again, $6.2 billion is the true floor of this business in terms of adjusted EBITDA, and that's more*

87

*kind of at or above that level going forward*. And lastly, we've embarked on *a ro-bust bottom-up work will complete by the end of the year*, and we look really forward to communicating that with you when it's completed.

So thank you very much, and that concludes the call for today. Thank you.

179.  In response to a question from Citigroup analyst Navann Ty about Viatris's expectations for 2022, Goettler stated: "*let me just re-emphasize again what I also said in my prepared remark, is that we really see the $6.2 billion in EBITDA as the true floor for this business. I think with the performance we have under belt now from both the first and the second quarter it's more, clear than ever to us that's the case.*" Later, in his concluding remarks, Goettler stated: "*I want to reiterate, again $6.2 billion is the true floor of this business in terms of adjusted EBITDA and that's more clear than ever.*"

180.  The statements set forth in paragraphs 173 to 179 above were false and misleading when made. It was misleading for Goettler to state that Viatris's second quarter results "validate the vision and the strategy we have in combining the 2 legacy organizations" without disclosing that Viatris was conducting a "thorough strategic review" to assess and potentially reshape that entire strategy.  It was also misleading for Goettler to cite Viatris's obtention of FDA approval for its interchangeable bio-similar, Semglee, and "steady progress across multiple programs" in its biosimilar and complex prod-ucts pipeline as "momentum" that made it "now clearer than ever" that "$6.2 billion in adjusted EBITDA" was "a true floor of our business going forward" without disclosing that Viatris was con-ducting a "thorough strategic review" in which Defendants were actively and seriously considering whether biosimilars and other parts of the business were "core" or "noncore," and thus lacked infor-mation necessary to know whether performance in biosimilars was indicative of future performance ensuring Viatris's adjusted EBITDA in future years would be above $6.2 billion. In fact, the thorough strategic review resulted in Viatris determining that biosimilars and other assets were not "core" parts of the business and should be divested, which Defendants admitted would lead to an estimated pro

forma adjusted EBITDA of $5 to $5.6 billion for 2022. *See* ¶¶ 112, 124. It was also misleading for Goettler to state that Defendants were making "good progress in our rigorous bottom-up strategic planning effort" and "[b]y better understanding how our portfolio will evolve over the next several years and looking at all the strategic levers at our disposal" without disclosing that the strategic plan-ning effort in fact involved a "thorough strategic review of the entire company" in which Defendants were actively and seriously considering whether biosimilars and other parts of the existing portfolio and pipeline were "core" or "noncore." It was also misleading for Goettler to state that biosimilars would be a "driver of growth for us going forward," because the Company was in the process or was soon to be in the process of a "thorough strategic review" during which the Company would actively and seriously consider whether biosimilars was a "core" or "noncore" part of the business, which process resulted in Viatris determining that biosimilars was not a "core" part of the business and should be divested.

### G. Citigroup BioPharma Conference

181. On <u>September 10, 2021</u>, Goettler and Malik presented to and spoke with analysts and inves-tors at the Citigroup BioPharma Conference, during which Defendants made false and misleading statements about Viatris's business model and strategy, its commitment to biosimilars, and its growth strategy, outlook, and potential.

182. Responding to a question from Citigroup analyst Navann Ty about "the areas where analysts could be too optimistic or where are you too conservative and waiting for visibility," Goettler re-sponded by stating, in relevant part, as follows:

> Ty:        And looking to 2022, the $6.2 billion floor, could that be conservative? Or do you think consensus is too high? So where -- I'm interested to know where are the areas where analysts could be too optimistic or where are you too conservative and waiting for visibility.
>
> Goettler:   Navann, I think we have to go back to what I actually said in the sec-ond quarter conference call. And what we said is at that time, *$6.2 billion of adjusted EBITDA as a floor -- as a true floor of our*

*business going forward* based on everything we saw at that time. This is not guidance for 2020, right? This is meant to be a support. It's meant to be *a floor in the interim period while we're working on our long-term outlook, while we're working on our strategic plan. And until we give guidance for '22 and years beyond, this was meant to be a helpful floor and information. That's what the $6.2 billion is.*

That brings me to *the strategic planning process. We're making good progress with that. It's a thorough bottom-up strategic planning efforts to really understand how our portfolio will evolve over the next several years. We're looking at all the strategic levers, and I'm looking forward to sharing that when the work is completed*, and the work will complete towards the end of the year.

Ty:            And just a follow-up on that, are you able to share some of the -- your internal longterm strategic planning assumptions to help us to have some visibility in the long term?

Goettler:      Yes. I think the intent is when we come out with that strategic plan that we give some further color and guidance on -- '22 guidance and long-term perspective and a good understanding of what the key drivers are and the actions that we're taking to improve shareholder value. Absolutely.

183.  The statements set forth in paragraph 182 above were false and misleading when made. It was misleading for Goettler to say that $6.2 billion of adjusted EBITDA was the "true floor of our business going forward" and that it was meant to be a floor in the interim period while we're working on our long-term outlook, while we're working on our strategic plan," without disclosing that Viatris was conducting a "thorough strategic review" in which Defendants were actively and seriously considering whether biosimilars and other parts of the business were "core" or "noncore," and whether the Company should divest in those noncore assets, and thus lacked the information necessary to know whether Viatris's adjusted EBITDA in future years would be above $6.2 billion after divestment of any noncore assets. . In fact, the thorough strategic review resulted in Viatris determining that biosimilars and other assets were not "core" parts of the business and should be divested, which Defendants admitted would lead to an estimated pro forma adjusted EBITDA of $5 to $5.6 billion for 2022. *See* ¶¶ 112, 124.

184.  During the same conference, Ty later also asked about Viatris's business development and

mergers and acquisitions activity to which Goettler responded, in relevant part, as follows:

> Ty:  And then switching -- very interesting discussion on free cash flow and dividend. Switching to business development. What is -- maybe staying on the credit profile. What is the gross leverage -- is there a gross leverage level that Viatris should reach before considering business development?
>
> Goettler:  Navann, I think just because we made a clear commitment to capital allocation and we're sticking to it and very committed to it, doesn't mean we are also looking at BD, right? There is a tremendous amount of opportunity that we look at every day. What it does mean, though, is that we're not going to do BD that gets in the way of these commitments because these commitments are very, very firm, right?
>
> …And I think investors should not forget, in addition to BD, we -- or actually BD is the addition to the R&D engine that we have. We have a strong internal R&D engine. *So we actually -- especially in biosimilars, complex generics. So we're actually in a position to be very disciplined. We're in a position to be very choosy and only add the right deals when we see them.* But don't mistake our commitments for lack of activity and interest [in this business area].
>
> Ty:  That's clear. And what areas of indications would you consider for potential M&A? And I think the last time we discussed, tuck-in acquisition Phase II assets, still the priority.
>
> Goettler:  I think I'll give more clarity on that when we lay out the strategic plan. *Obviously, we're a company that's not focused on a particular therapeutic area at the moment.* We have broad opportunities, both geographic as well as therapeutic area-wise. And as we lay out the strategy, we can also then give more clarity on areas of focus going forward.

185.  Ty then asked Malik about what "excites you the most in Viatris pipeline," to which Malik

responded, in relevant part, as follows:

> Thanks, Navann, for your question. There are many -- not just one, there are many exciting opportunities in our pipeline. *For the last several years, we have been working diligently to move our pipeline towards more complex and the biosimilars.* And we have several notable successes over these last few years.
>
> *Today, as an outcome of this, we have a robust pipeline with 75% of our pipeline spent in that bucket where we are basically focusing on the complexity.* Now some of the examples, if I just start with the biosimilars. In addition to what we have already delivered in terms of the biosimlar to Herceptin, Neulasta and (inaudible)

recently, as part -- the interchangeable, as part of Avastin, EYLEA, Hulio, BOTOX, Perjeta, Toujeo and I can go on several other programs, which are in an early stage and we have not yet disclosed.

.… *So if I look into our next 5 to 7 years, just to complement what Bill and Michael said, we have a very strong internal pipeline and execution around the science, clinical trials, the medical, regulatory as well as the IP legal.* And we have delivered it repeatedly, whether it's a first-to-market opportunity on Wixela, Co-paxone are now interchangeable, delivering the first interchangeable biosimilar, which is Semglee. So very exciting opportunities from a pipeline point of view.

186.  Ty then followed up by asking about Viatris's biosimilars strategy going forward and the importance of interchangeability, to which Malik and Goettler responded, in relevant part, as follows:

Ty:             And may I ask you some follow-up question on biosimilars. Maybe your strategy going forward and how important is the interchangeability for your strategy away from Semglee as well -- including and away from Semglee?

Malik:          Yes. *Biosimilars is and will continue to be an important area for the company and will be a key growth driver, a key driver for our future growth.* And let me also say, it's a little bit too early in the bio-similar space as this market is evolving, as it's in its infancy that we should say that we should not go on the predicting game of the winners and losers.

*The first part of our strategy is to build the portfolio because we believe having a deep and broad offering around commercial portfolio will ensure a robust strategy, will be the first leg of de-livering the strategy.* And I just gave you several examples of our pipeline where we are either executed already or well on our way to execute on that.

And then second, I think -- so our -- first one is delivering, and that's where the speed to market, being first to the market, having effective cost of goods, all those things, all those come together. And then the second part is as we have gone around the world, launched these prod-ucts, starting with the U.S.A., Europe and many other emerging mar-kets, we're having -- we had many learnings. And it's not just contrac-tual game as game -- as product life cycle evolves, you need more than the contractual capabilities, and we are mapping those. We are building those capabilities as we go along. And I remain very, very optimistic that it's -- we have done pretty well from a science point of view. We have done -- we have a mixed bag from the commercial execution point of view. We have several successes Toujeo in Japan. First Her-ceptin in Australia, Canada. First Fulphila, which is a biosimilar.

92

Neulasta in U.S.A. *So we have some several key successes, and I think we're going to build upon that....*

Goettler:    Yes. I think, Rajiv, you hit on the key points. And maybe what I can add is from a strategy perspective, it's very clear that biosimilars is not a mature market yet, and it's a growing market. ***There's no doubt about it. And therefore, with the capabilities we have, it is and will be and can be a growth driver for Viatris.***

We've made significant investments in building the pipeline. We've shown that we can deliver on the science and bring these innovative products to the market. We have only a few molecules now, but already these few molecules are 150 marketing authorizations in 85 countries. So it shows our ability to take this and really take a global approach to it.

And we have, and Rajiv mentioned a few examples, we have one of ***the most diverse and strongest pipeline in biosimilars to follow that. So what that means is in the future, that portfolio, that pipe-line will translate into a commercial portfolio and gives us one of the strongest commercial portfolios in the industry. I believe that having that broad portfolio is actually important....***

So I agree with Rajiv. It's too early to declare winners and losers in the market. It's a developing market. ***And you should fully expect us, again, as part of the strategic plan process that we'll look into the biosimilar opportunity very deeply, and then we consider it, and we'll make it a significant source of growth for Viatris going for-ward.***

187. The statements set forth in paragraphs 184 to 186 above were false and misleading when made. It was misleading for Goettler to state that Viatris's strong internal R&D engine "especially in biosimilars" place Viatris "in a position to be very choosy and only add the right deals when we see them" without disclosing that Viatris was conducting a "thorough strategic review" in which Defend-ants were actively and seriously considering whether biosimilars and other parts of the business were "core" or "noncore," and whether the Company should divest in biosimilars and those other noncore assets. It was also misleading for Goettler to state that "we're a company that's not focused on a particular therapeutic area at the moment" without disclosing that the Company's "thorough strategic review" involved active and serious consideration of reshaping Viatris's entire business model to no

longer be "agnostic to any particular therapeutic area." As Defendants later admitted, that strategic review included a "thorough analysis" the Company's "current strengths and capabilities," among other things, which led to "clear results" that "some therapeutic areas had too much competition or too much scientific risk for us to see a credible path to leadership in the time horizon that we're looking at," "others were too small or didn't provide enough room for innovation," and that three therapy areas, ophthalmology, dermatology and gastrointestinal, "particularly hit the sweet spot for us." *See* ¶ 113. It was also misleading for Malik to state that "we have been working diligently to move our pipeline towards more complex and the biosimilars," and for Malik to state that "biosimilars is and will continue to be an important area for the company and will be a key growth driver, a key driver for our future" without disclosing that Viatris's "thorough strategic review" involved active and serious consideration of whether biosimilars was a "core" or "noncore" part of the business. It was also misleading for Goettler to state that investors "should fully expect us, again, as part of the strategic plan process that we'll look into the biosimilar opportunity very deeply, and then we consider it, and we'll make it a significant source of growth for Viatris going forward" without disclosing that the strategic plan process was in fact a strategic review that consisted of the active consideration of whether biosimilars was a noncore part of the business and thus would not be "a significant source of growth for Viatris going forward." In fact, the thorough strategic review resulted in Viatris determining that biosimilars and other assets were not "core" parts of the business and should be divested.

## H. Third Quarter Earnings Call

188. On November 8, 2021, Viatris announced its financial results for the third quarter of 2021. In a conference call that Viatris held that day to discuss the results with analysts, Goettler and Malik, as well as other Viatris executives, presented to and spoke with analysts and investors, during which Defendants made false and misleading statements:

189.  In his opening remarks, Goettler touted Viatris's recent successes in biosimilars, stating, in

relevant part, as follows:

> In North America, we're preparing for the imminent launch of Semglee, which, as
> most of you know, received a historic approval from the FDA for the industry's first-
> ever interchangeable biosimilar designation in the U.S. in July. We expect that Semglee
> will be available in pharmacies before the end of the year, and we believe this is an
> important milestone to help increase access to insulin for those living with diabetes in
> the United States. …
>
> In addition, at the end of October, we filed a BLA for our biosimilar to EYLEA with
> the FDA as planned. We believe this is the first biosimilar registration of this important
> medicine to treat age-related macular degeneration. And looking further into the fu-
> ture, we're excited about the potential to be first-to-market for our BOTOX biosimilar.
> Overall, we generated $158 million in new product revenue in the third quarter, $557
> million year-to-date, and we're, therefore, well on track for approximately $690 million
> in new product revenue for the full year.
>
> On the last quarter's earnings call, we said we would reevaluate our 2021 financial
> guidance at the end of the third quarter. Based on our strong performance to date, we
> are, again, raising our financial guidance across total revenue, adjusted EBITDA and
> free cash flow, which Sanjeev will discuss in more detail later. I'm also pleased to say
> that we are near completion of our rigorous bottom-up strategic planning effort.
>
> We look forward to sharing the results of these plans with the investment community
> at a virtual investor event now scheduled for the morning of January 7, 2022. And on
> that day, we'll provide additional details on our 2-phase strategic road map, including
> for the rest of Phase I, that is the years 2022 and 2023, we'll be providing specific
> financial guidance, targets and metrics to complete this phase. …with that said, *we
> continue to remain confident that $6.2 billion of adjusted EBITDA is the true
> floor of our business.*
>
> For Phase II of our road map that's 2024 and beyond, we will provide an overview of
> the catalysts that we expect will drive future growth, including laying out our capital
> allocation priorities for the space in order to maximize and further unlock shareholder
> value during this period. We'll also be giving specific details of our own organic op-
> portunities by discussing our own pipeline at length, and we will be providing the in-
> organic business development priorities that we'll be focusing on through our Global
> Healthcare Gateway.

190.  In response to a question from JPMorgan analyst Chris Schott about factors explaining Vi-

atris's updated guidance setting a $6.4 billion midpoint for adjusted EBITDA in 2021 "versus" the

$6.2 billion "floor" and "trough number," Goettler stated, in relevant part, as follows:

Schott:  I know you're targeting a January 7 Analyst Meeting but do appreciate the comment on, I think it was $6.2 billion in EBITDA as a floor for the business. I guess my question here was, I think in the past, you've talked about 2021 as a trough number. I know you've raised the guidance a few times have gone through this year. So let me just understand a little bit what's going on here. Some of the upside we're seeing, I guess, more onetime in nature this year. Or are there any other factors that contribute to that dynamic? I'm just trying to kind of bridge between, I guess, a new midpoint of $6.4 billion versus that floor $6.2 billion….

Goettler:  …On the EBITDA question you have, clearly, we're not giving guidance today. We're very, very pleased with the performance that we have, now 3 consecutive quarters. ***We strongly feel that we stabilize this business. We got a good handle on the business. We now finished or almost finished the bottom-up rigorous strategic planning process. And with that, we're reconfirming again what we said before, the $6.2 billion is the floor.*** That means floor. It doesn't mean that's part of the guidance. It's a floor. But that's a floor that's very, very important because that drives how we can deliver on Phase I, right? We laid out our clear priorities, what we need to do. EBITDA drives cash flow, it's not the only thing that's driving cash flow, it's one of the things driving cash flow, and remain confident that the EBITDA, combined with, and you can easily do the math yourself, $8 billion or more in cash flow over those 3 years, sets us up to deliver on our Phase I commitments. We remain confident we can do so.

191.  The statements set forth in paragraphs 189 and 190 above were false and misleading when made. It was misleading for Goettler to state that "we strongly feel that we stabilize[d] this business" and have "a good handle on the business," without disclosing that because of the Company's "thorough strategic review" that Viatris had "now finished or almost finished," Viatris had decided to "reshape the entire business" and by that time had concrete plans to divest its entire biosimilars business. *See* ¶¶ 211, 211. It was also misleading for Goettler to state that having "now finished or almost finished the bottom-up rigorous strategic planning process" they were ***reconfirming again what we said before, the $6.2 billion is the floor,"*** without disclosing that because of the Company's "thorough strategic review" that Viatris had "now finished or almost finished," Viatris had determined whether parts of its business were "core" or "noncore," and intended to divest its biosimilars business

96

and other assets determined to be noncore,  which, as Defendants later admitted, would lead to an estimated pro forma adjusted EBITDA of $5 to $5.6 billion for 2022. *See* ¶¶ 112, 124.

192.  Malik followed with his own opening remarks, during which he emphasized the "significant value and the depth" of Viatris' biosimilars pipeline, highlighting that biosimilars was integral to the growth in several segments, stating, in relevant part, as follows:

> Thank you, Michael, and good morning, everyone. Before I get into the quarter at hand, I would like to echo Michael's excitement about our upcoming investor event. What you can expect to hear from me is a comprehensive review of the *significant value and the depth of our pipeline and clinical programs, including biosimilars,* complex generics and our medicines *that we have been strategically building over many years. These development programs are expected to play a significant role in our ability to drive organic growth over time,* especially as our cost synergies roll off at the end of 2023. Once laid out in January, *we believe our pipeline will be recognized as one of the company's most underappreciated assets* that will enable us to continue to deliver value while fulfilling our mission of expanding access and addressing patient needs.
>
> ….Overall, the business performed strongly across all of our segments versus our expectations. … Our complex generics and biosimilar category performed in line with our expectations. *We are pleased with the continued growth of our global biosimilars portfolio this quarter, which grew by 14% and helped to offset anticipated competition related to select complex generics products.*
>
> …Our developed markets performance was slightly above our expectations for the quarter. Europe continues to perform very well, …. Biosimilars in Europe grew by over 50% led by our strong position of Hulio in Germany.
>
> Moving to North America, we are very pleased with our overall performance….. Complex generics and biosimilars in North America was better than our expectations with strong performance in biosimilars, which helped to absorb the competitive impact on Wixela and XULANE….
>
> ….With our new launches performing to our expectations and our base business anticipated to be in line with our expectations of approximately a 4% base business erosion for the year, I feel very strong about the underlying building blocks of this business.

193.  The statements set forth in paragraph 192 above were false and misleading when made. It was misleading for Malik to state that biosimilars are "expected to play a significant role in our ability to drive organic growth over time" and that "our pipeline will be recognized as one of the company's

most underappreciated assets" without disclosing that Viatris had "now finished or almost finished" a "thorough strategic review" of its entire business in which it had determined that biosimilars was not a "core" part of the business and should be divested and that by that time, Viatris had concrete plans to sell its biosimilars business to Biocon Biologics. *See* ¶¶ 211, 211.

### I.    Evercore ISI HealthCONx Conference

194.    On December 1, 2021, Goettler, Malik, and Narula, presented to and spoke with analysts and investors at the Evercore ISI HealthCONx Conference, during which Defendants made following false and misleading statements:

195.    At the beginning of the question-and-answer portion of the conference, Evercore analyst Umer Raffat began with asking about news that "one of the big three generics business potentially getting spun out of Novartis" and that the Novartis Chairman was asked in an interview the previous night about the "possibility of a combination with one of the large players like Teva or Mylan/Viatris," asking whether Viatris would "think about something like that" or was "even contemplating," to which Goettler responded, in relevant part, as follows:

> Raffat:    Maybe just at a high level for you, Michael, for Rajiv, Sanjeev, all 3 of you perhaps. There's a lot of buzz out there right now around another large -- one of the big 3 generics businesses potentially getting spun out of Novartis. And there was an interview last night with Novartis Chairman, where they were asked if there's any possibility of a combination with one of the large players like a Teva or Mylan, Viatris. I guess, how do you guys think about something like that? Is that even something you guys are even contemplating? Plus, wouldn't there be some massive antitrust problems with anything like that in the first place?

> Goettler:    Yes. So I can comment on that. I think our strategy has been very clear we laid it out, right? We break it into 2 phases, what we call the Phase 1 with year '21, '22, '23. And what we want to focus on there is on delevering, on paying back our debt, on growing the dividend and delivering on the integration and the synergies. We're well on track for that, and we're strongly committed to that. Phase 2 is about our catalyst to growth. It's new capital allocation priorities, unlocking more value for shareholders and delivering on our pipeline and moving up the value chain to a more sustainable, longer life cycle type of products.

We look forward to sharing details on that with you on our investor event on January 7.

So all I can say is we also read the reports this morning of what Joerg Reinhardt commented. *I can tell you we haven't had any discussions on the topic*. Of course, if there's a possibility to create more shareholder value, we consider it, *but it's not something we're actively considering at this point.*

196.  The statements set forth in paragraph 197 above were false and misleading when made. It was misleading for Goettler to state that they "haven't had any discussions on the topic" and were not "actively considering" any combinations with large players in the pharmaceutical market without disclosing that by that time, Viatris had concrete plans to sell its entire biosimilars business to Biocon Biologics, *see* ¶¶ 211, 211, in a transaction that was finalized just two months later, *see* ¶ 106.

197.  Raffat next asked about Viatris's two-phased Strategic Roadmap and asked whether it was correct that after "flattish" growth in Phase I, "there's a post '23 phase when some of the investments historically from the R&D organization in the biosimilar starts to set the case for growth," to which Goettler and Malik responded as follows:

Raffat        Maybe turning a little more specific then. I know from a business perspective, the Street expectations on your business are sort of in 2 phases right now. There is a near-term phase where business is being modeled to be flattish, and then there's a post '23 phase when some of the investments historically from the R&D organization in the biosimilar starts to set the case for growth. Is that consistent with how you guys think about it? And how does that translate from an EBITDA perspective near term versus post '23?

Goettler:     Yes. So look, I mean, I think, you're looking at it right. We think of it also in 2 phases. We look at it in the Phase I where our commitments are very, very clear, and then a Phase II. We're not giving guidance today. Obviously, we're going to lay out on our Investor Day exactly how we deliver on our commitments for Phase I. *And then we're going to give you the catalyst for the growth in Phase II. And the catalysts are our pipeline, which we think is underappreciated. We've got some very strong investments in biosimilars, in complex generics that will drive it.* We're going to talk about our capital allocation priorities for that time and how we unlock value for shareholders. *And I think the pipeline is really key.* And maybe, Rajiv, you can give a couple of pointers on the pipeline.

Malik:  No. Thanks, Michael. And I think the Phase 2, and as, Umer, you said, pipeline, the complexity and all that elements, which we have been building in, I think there are 2 elements, which are under appreciated. One is the -- what is the new model or algorithm of a complex product. And we are getting more and more data points, and it's both the sustainability and the durability of this pipeline.

And if you see like go back, right, from '18 to '19 or '20, there has been 1 or 2 anchor launches like it was Copaxone in '18; '19, it was Wixela; '20, it was Herceptin and Fulphila. And then this year is going to assembly and as part next year. As we go into '23, '24, it's more than one over there, whether it's the GA once a month, whether it's a BOTOX coming in '25, '26, whether it's coming to EYLEA.

So those launches, I think, the **concentration of those complex launches starts building up**. And also, you would see the contribution of '22, '23 launches is not going to fade out. ***So I'm very excited to share with you guys on the Investor Day what are the catalysts for Phase 2 and how they're going to contribute to the -- and it's going to -- my feel is, once we do all that math, it's is going to make our base business relatively more durable than it was yesterday or it today.***

198.  The statements set forth in paragraph 197 above were false and misleading when made. It was misleading for Goettler and Malik to state that the "catalysts" for growth included "our pipeline" of biosimilars that was "going to make our base business relatively more durable than it was yesterday or it today" without disclosing that Viatris had "now finished or almost finished" its "thorough strategic review" of its entire business in which it had determined that biosimilars was not a "core" part of the business and should be divested, and that as a result, Viatris by that time had concrete plans to sell its entire biosimilars business to Biocon Biologics, *see* ¶¶ 211, 211, in a transaction that was finalized just two months later, *see* ¶ 106.

199.  Raffat then asked about the "impact of inflation on raw material prices heading into 2022," to which Goettler and Narula responded, in relevant part, as follows:

Raffat:  …So the way I thought about it is, when I cover a company like a branded big pharma company like Bill's prior company, when the gross margins are 80% plus, plus/minus 200 bps doesn't move around a whole lot, which is technically a 10% move on the COGS as a percentage of revenue. But when we're talking about COGS, which

is 50% of revenues are in that ballpark, up 10% swing back and forth could move around your gross margins quite substantially. I guess how should we think about the impact of inflation on raw material prices heading into 2022?

Goettler:  Yes. Umer, if I may, I think, *we have all the different pushes and pulls, some of what you mentioned some that weren't mentioned, right? I mean, obviously, we have got the natural erosion. We got the pipeline that Rajiv mentioned. We've got inflationary pressures. We've got the FX, we've got all these things. But taking all of them into account, what I can say, and again, we're not giving guidance, the guidance will come on January 7, but we remain confident that the $6.2 billion we put out there as a floor, continues to be the floor.* And that's really for EBITDA, adjusted EBITDA. And that's really an important number because that floor of adjusted EBITDA allows us to deliver on our commitment, allows us to generate $8 billion or more in cash flow over the 3 years. And with that, pay down the debt and grow the dividend, which is a commitment that we had for the Phase I. So I think that's the bottom line picture here. There are lots of pushes and pulls on that, but we're very confident in delivering on that.

Raffat:  Got it. Maybe -- and just to pin it down just a bit more, Michael, and maybe for you, Sanjeev, as well. The business is tracking somewhere -- at least by sell-side numbers, somewhere between $17.5 billion and $18 billion in revenue, somewhere in that range. And consensus is modeling high 50s in gross margin and basically holding it steady year-over-year. So my takeaway from sort of looking at numbers being flat year-over-year on gross margin, but then looking at these raw material prices is there must be 100 to 200 bps of sort of gross margin that should be lower on a year-over-year basis, which could even perhaps drive EBITDA to fade just a little bit. Or how should I think about that?

Narula:  Yes. Yes. So Umer, there is clearly going to be a gross margin. I mean that we fully expect that, and we've been very clear about that. We expect that to happen both from the evolving gross margin mix and then the inflation we talked about that.

Now the impact on EBITDA, obviously, we'll talk about that on January 7, but we also have the synergy flow-through that's going to happen this year, next year and the year after that. So obviously, you've got to keep that in mind to figure out. As Michael pointed out, I think, *the key thing to note about it is the $6.2 billion is the floor.* And rest of all that, what the number comes out is probably something that we'll talk about at the Investor Day on January 7.

101

Raffat:          Got it. So it sounds like *there's enough levers in the business to pull to ensure that EBITDA strength -- EBITDA momentum continues even while absorbing impact from a gross margin pressure. Am I hearing that right?*

Narula:          *I think -- yes,* go ahead, Michael.

Goettler:        Yes, we're not giving guidance, *but the $6.2 billion is the floor and we're confident in that.*

200.  The statements set forth in paragraph 199 above was false and misleading when made. It was false or misleading for Goettler to state that they had taken "inflationary pressures" and "foreign exchange" into "account" to be able to "remain confident that the $6.2 billion we put out there as a floor continues to be the floor," because, as Defendants later admitted two months later, Viatris's 2022 financial guidance estimated that adjusted EBITDA would fall well below $6.2 billion, which Defendants attributed to "foreign exchange" and "inflation on the input cost," resulting in headwinds on EBITDA amounting to $120 million and $196 million, respectively. *See* ¶ 128. It was also misleading for Narula and Goettler to state that "there's enough levers in the business to pull to ensure that EBITDA strength -- EBITDA momentum continues" without disclosing that Viatris had "now finished or almost finished" its "thorough strategic review" that had determined that biosimilars and other assets were not "core" to the business and should be divested, and that Viatris had by that time concrete plans to sell its entire business to Biocon Biologics, *see* ¶¶ 211, 211, in a transaction that was finalized just two months later, *see* ¶ 106. Defendants knew that it did not have "enough levers in the business to ensure that EBITDA strength [and] momentum continues even while absorbing impact from a gross margin pressure" and that this momentum would be enough to ensure that the Company would achieve adjusted EBIDTA greater than $6.2 billion in 2022 and future years. In fact, as Defendants later admitted just two months later, Viatris's divestments of biosimilars and other noncore assets would lead to an estimated pro forma adjusted EBITDA of $5 to $5.6 billion for 2022. *See* ¶¶ 112, 124.

## II.    Summary of allegations that Defendants knowingly or recklessly misled investors

201.   As set forth above and further below, numerous facts demonstrate that the Individual Defendants knew or were deliberately reckless in not knowing that Defendants' statements identified above were materially false or misleading when made. The scienter of Viatris as a corporate entity is derived from the scienter of its executives, including, but not limited to, the Individual Defendants.

202.   As alleged in this Complaint, Defendants Goettler and Malik, plus other executives like Narula, Mauro, and Owens, have long determined Viatris's strategies, decisions, and messaging to the investing public. Goettler was the group president of Pfizer's Upjohn division before it merged with Mylan to create Viatris, and served as Viatris' Chief Executive Officer and a Director throughout the Class Period. Similarly, Malik served as President and Director of Mylan before its merger with Upjohn, continuing to serve as Viatris's President and a Director throughout the Class Period. And during the Class Period, Mauro served as Viatris's President of Developed Markets and Walt Owens served as Viatris's Global Head of Research and Development.

203.   In their respective roles, the Individual Defendants were able to, and did, determine the content of Viatris's disclosures and other public statements pertaining to Viatris during the Class Period. Each of the Individual Defendants attended earnings calls and investor conferences and spoke on behalf of Viatris throughout the Class Period. *See* ¶¶ 53-128. During those calls and conferences, each of the Individual Defendants answered analysts' questions on behalf of the Company during quarterly earnings calls. *See id.*

204.   Further, the Individual Defendants participated in the drafting, preparation, and/or approval of such public statements and were provided with copies of the documents alleged herein to be false and misleading prior to or shortly after their issuance and had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants were responsible for ensuring the accuracy of the public reports and releases detailed herein and for verifying that the

facts supported the statements and there were no material omissions. They are therefore liable for the misrepresentations and omissions therein.

205.  As the most senior executive officers of Viatris, the Individual Defendants were privy to confidential and proprietary information concerning Viatris, its business model, growth strategy, and performance. Each of them also: (i) had access to, *inter alia*, internal corporate documents and conversations with corporate officers and employees; (ii) attended management and Board meetings and meetings of committees thereof; and (iii) reviewed reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

206.  Many allegations set forth above collectively give rise to the strong inference of scienter that Defendants knowingly or at least recklessly misled investors about Viatris's business model and strategy, including its commitment to biosimilars as the Company's key growth driver, and the Company's growth strategy, outlook, and potential generally. These allegations include the following.

207.  *First,* The Individual Defendants spoke repeatedly about Viatris's business model and strategy, the importance of its biosimilars segment, and their confidence about the Company's growth prospects, which they assured investors were based on their knowledge and understanding of the Company's business, "all the levers that we can have," "the robustness of our business," "the base erosion that we have in the business," the "headwinds and tailwinds" that the Company was facing, and "the new pipeline revenue we can bring," as well as their clear visibility into "growth driven by EBITDA and lower onetime costs." *See* ¶¶ 81, 85-86, 156, 162, 170.

208.  Goettler repeatedly claimed to have deep knowledge and understanding of the Company's business that informed his repeated assurances that he was confident that Viatris's business model established a $6.2 billion floor for the Company's business. On May 10, 2021, for instance, Goettler

stated that his "high confidence" of the $6.2 billion floor was driven by his knowledge and understanding of the Company's business, along with clear visibility into "growth driven by EBITDA and lower onetime costs," and "understanding of the base erosion that we have in the business" and "the new pipeline revenue we can bring." *See* ¶ 81. Malik likewise assured investors on March 1, 2021 that his and the other Defendants' confidence about the Company's business model and growth potential was based on a "disciplined approach to understanding" the Company's "growth potential on a granular level," and "a rigorous performance a management process focused on execution and results." *See* ¶ 70. And when Viatris announced its reshaping initiative at the end of the Class Period, Goettler attributed the Company's decision and their conclusions to a "thorough strategic review of our entire business" conducted through 2021, which involved an evaluation of what was "core and what was noncore to the future of our company." Likewise, Malik explained that their divestiture plans were informed by "an extensive strategic review." *See* ¶ 108.

209.  *Second,* as Defendants later revealed, "throughout 2021," they had conducted a secret but "extensive," "comprehensive," and "through strategic review of our entire business," in which the actively and seriously assessed the Company's business model, strategy, and whether product categories were "core" or "not core" parts of the business. *See* ¶ 108. As Defendants explained, the output of that strategic review was the determination to "reshape the entire company," including its business model," in a manner that conflicted with almost every key element of the business model that Defendants consistently touted throughout 2021.

210.  During the remarks to analysts and investors on February 28, 2022, Goettler explained that "through 2021, we conducted a thorough strategic review of our entire business" to determine "what was core and what was noncore to the future of our company." *See* ¶ 108. Goettler then explained that the "output of that review" was "a significant global reshaping initiative" and that the "first-but-critical step" of that initiative was the sale of its biosimilars business to Biocon. Thus, the notion of

whether Biosimilars was a core part of the business or not, or whether it should be sold, was in play at Viatris throughout 2021, yet the investing public was falsely led to believe that Biosimilars was an essential part of Viatris' growth strategy and a business they would be keeping for many years. This was a material omission to the many statements made by Viatris and its top executives to the marketplace and those deciding whether to purchase Viatris stock.

211.  Further, Defendants were not only actively and considering the sale of Viatris's biosimilars business throughout 2021, they had concrete plans to do so sometime before the fall of 2021, with Viatris and Biocon entering into a Confidentiality Agreement to facilitate the negotiations for the Biocon Biosimilars Transaction on October 26, 2021. *See* ¶ 109. In addition, on December 9, 2021, *Moneycontrol.com*, an online business and financial news website in India, published an article entitled, "Exclusive | Biocon in talks with Mylan to merge biosimilar business, plans IPO after merger: Sources," which reported that Viatris (which the article referred to as Mylan) was in "advanced talks" to combine its biosimilars business with Biocon Biologics. According to the article, the combination would create a large company in which Biocon would seek to hold a controlling majority stake, with plans to potentially take the merged entity public in an initial public offering with a valuation of $10 billion, noting that in response to inquiries to both Viatris and Biocon, both companies issued identical responses, refusing to "comment on market rumours and speculation." At the time, the article otherwise received little if any attention from analysts or other investors.

212.  Finally, throughout 2021, Defendants consistently referred to a "strategic planning exercise" or "process" since Viatris's Investor Day in March 2021, they consistently characterized (and analysts understood) that exercise as focused on providing "further color" on "our long-term outlook," *see* ¶ 96, and "specific financial guidance, targets, and metrics" for Phase I of the Strategic Roadmap in "2022 and years beyond," *see* ¶¶ 99, 189, based on an existing business model that Defendants had said from day one was "essentially complete" with "all the strategic tenets…in place," *see* ¶ 57, 76, not

a wholesale review focused on determining what was core and what was noncore to the business to develop a new business model from scratch. Indeed, unlike Mylan's 2018 Strategic Review, which was publicly announced at the outset and described its scope, *see* ¶¶ 40-44, Defendants kept the scope of the 2021 Strategic Review a secret. Far from the "strategic planning" exercise that Defendants had mentioned, the strategic review fundamentally changed every key aspect of Viatris's business model, including its commitment to a broad and diversified portfolio of products that was "agnostic to therapeutic area," with biosimilars as its key growth driver. *Compare* ¶¶ 60, 84, 86, 95, 143, 155, 155, 160, 165 *with* ¶¶ 106-107, 113, 115, 125.

213. Each of these facts show that during the Class Period, when Defendants touted Viatris's business model and strategy, commitment to biosimilars, and growth outlook, they were actively and seriously considering to "reshape the entire company" to abandon every key aspect of that business model and strategy.

214. *Third,* Defendants' statements touting Viatris's business model, its biosimilars segment and growth strategy, and its growth prospects were critical to analysts and investors who sought to value the Company during the Class Period. When reaching their conclusions about valuations of Viatris, analysts relied on Viatris's repeated expressions of confidence about Viatris's broad and diversified business model and its purported commitment to biosimilars as the "cornerstone of future growth," which ensured that 2021 would be the "trough year" and "floor," effectively guaranteeing stable and durable growth in future years. *See* ¶¶ 73-74, 93, 101. The importance and centrality of these subjects to Viatris's valuation for investors support the inference that Defendants were, at minimum, deliberately reckless in making the false and misleading statements to investors that they did.

215. Finally, by virtue of their high-level positions as the most senior officers of the Company, participation in and awareness of Viatris's day-to-day operations, and control over the issuance of the false or misleading statements alleged above, the knowledge or recklessness of the Individual

Defendants concerning Defendants' false or misleading statements is imputed to Viatris. In addition, the knowledge or recklessness of other senior employees and managers, whether or not named herein, concerning the Company's false and misleading representations about its business model, growth strategy, and growth potential are also imputed to Viatris. Accordingly, by no later than March 2021, prior to the start of the Class Period, Viatris knew about or recklessly disregarded its false and misleading statements about the Company's business model, growth strategy, and growth potential.

## III.  Loss Causation and Economic Loss

216.  The fraud described herein was the proximate cause of declines in Viatris's stock price and resulting losses suffered by the Class.  Defendants' materially false and misleading statements and omissions artificially inflated and/or maintained the price of Viatris stock. The artificial inflation in Viatris's stock price was removed through disclosures concerning the facts concealed and/or misrepresented by the misstatements and omissions, described below. These disclosures reduced the amount of inflation in the price of Viatris's publicly traded stock, causing economic injury to Plaintiff and other members of the Class.

217.  The false and misleading statements concerned (1) Viatris's business model and strategy to leverage its broad and diverse portfolio spanning all categories of pharmaceutical products, including brand-name drugs, generics, complex generics, and biosimilars; (2) Viatris's commitment to biosimilars as the Company's key growth driver and core part of the Company's long-term strategy to offset inherent base business erosion; and (3) Viatris's growth strategy, outlook, and potential, specifically its growth from its 2021 "trough year" and "floor" of $6.2 billion in adjusted EBITDA.

218.  When the truth was disclosed on February 28, 2022, Viatris's stock price declined significantly as the artificial inflation was removed from the stock price.

219.  In the press release issued that day, as well as in a conference call with analysts, Defendants announced that Viatris had completed an "extensive," "comprehensive," and "thorough strategic

review of our entire business" that had been conducted "throughout 2021" that resulted in a "global reshaping initiative" that would "reshape the entire company," starting with the sale of Viatris's entire biosimilars business to Biocon Biologics.

220.  On this news, the price of Viatris's common stock fell $3.53 per share, or 24.28%, to close at $11.01 per share on February 28, 2022, on unusually high trading volume of more than 62 million shares, nearly four times the trading volume on the previous trading day.

221.  On the same day, multiple analysts published reports explaining the significance of the disclosure. In its February 28, 2022 report titled "Ugly Guide, With a Lurch to New Strategic Priorities," Piper Sandler wrote that Viatris's pivot created a "credibility cap," explaining that "lurching from strategy to strategy is hardly investor-friendly)" and that Viatris was "essentially throwing in the towel regarding key aspects of the business model that emerged from that transaction."

222.  The next day, on March 1, 2022, Raymond James published a report titled, "Downgrading to Market Perform; Outlook Disappoints, Shares Hammered, Déjà vu All Over Again," in which it wrote that they "saw the biosimilars business as the main source of excitement and future growth, at least on the top-line, in a company that had seen steep base business erosion," adding that Viatris's announcement "decidedly turned VTRS into much more of a show me story that it was already."

223.  On the same day, UBS published a report explaining that given management's "repeated assurance" that 2021 "would be a trough year, the pivot from the prior guide and sparse financial guidance past 2022 were disappointing," a problem that was only "magnified" by Viatris's sale of its biosimilars segment, its "historical growth driver," with more divestitures to come.

224.  In the wake of these reports, the price of Viatris's common stock continued to tumble, falling by $0.86 per share, or 7.81%, to close at $10.15 per share, on continued unusually high trading volume of more than 62 million shares.

225.  It was entirely foreseeable that Defendants false and misleading statements discussed herein would artificially inflate the price of Viatris's stock. It was also foreseeable to Defendants that the revelation of the truth concerning Viatris's business model, strategy, and growth outlook would cause the price of the Company's stock price to fall as the artificial inflation caused by Defendants' false and misleading statements was removed. Thus, the stock price declines described above were directly and proximately caused by Defendants' materially false and misleading statements and omissions.

## IV.  Presumption of Reliance

226.  At all relevant times, the market for Viatris common stock was efficient for the following reasons, among others:

    a.    Viatris's stock met the requirements for listing, and was listed and actively traded on the Nasdaq Stock Market, a highly efficient and automated market;

    b.    as a regulated issuer, Viatris filed periodic reports with the SEC and the Nasdaq Stock Market;

    c.    Viatris regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

    d.    Viatris was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales forces and certain customers. Each of these reports was publicly available and entered the public marketplace.

227.  As a result of the foregoing, the market for Viatris common stock reasonably promptly digested current information regarding Viatris from all publicly available sources and reflected such

information in the price of Viatris common stock. All purchasers of Viatris common stock during the Class Period suffered similar injury through their purchases of Viatris common stock at artificially inflated prices, and a presumption of reliance applies.

228. A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## V.    Class Action Allegations

229.  Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the common stock of Viatris between March 1, 2021 and February 25, 2022, inclusive, and who were damaged thereby. Excluded from the Class are Defendants; the officers and directors of Viatris at all relevant times; members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns; Defendants' liability insurance carriers and any affiliates or subsidiaries thereof; and any entity in which Defendants or their immediate families have or had a controlling interest.

230. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Viatris shares were actively traded on the Nasdaq Stock Market.

231. As of August 2, 2023, Viatris has over 1.1 billion shares of common stock outstanding, owned by hundreds or thousands of investors. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least tens of thousands of members of the proposed Class. Class members who purchased Viatris common stock may be identified from records maintained by Viatris or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

232. Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law as complained of herein.

233. Plaintiff will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

234. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

    a.    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

    b.    whether Defendants made statements to the investing public during the Class Period that were false, misleading, or omitted material facts;

    c.    whether Defendants acted with scienter; and

    d.    the proper way to measure damages.

235. A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

## VI. Inapplicability of the Statutory Safe Harbor and Bespeaks-Caution Doctrine

236. The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pleaded in this Complaint. None of the statements complained of herein was a forward-looking statement. Rather, the statements were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about, among other things, Viatris's

business model and strategy, its commitment to biosimilars as the Company's key growth driver, and its growth strategy, outlook, and potential.

237.   To the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. As set forth above in detail, then-existing facts contradicted Defendants' statements regarding, among other things, Viatris's business model and strategy, its commitment to biosimilars as the Company's key growth driver, and its growth strategy, outlook, and potential. Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Viatris were not sufficient to insulate Defendants from liability for their false or misleading statements.

238.   To the extent that the statutory safe harbor does not apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of Viatris who knew that the statement was false when made.

## VII. Causes of Action

### Count I: Violation of Section 10(b) of the Exchange Act
### (Against all Defendants)

239.   Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

240.   This Count is asserted on behalf of all Class Members against all Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

241.   During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained

misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

242.  Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Viatris common stock during the Class Period.

243.  Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous practice and course of conduct that operated as a fraud and deceit upon Plaintiff and the Class, and made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and did so intentionally or with deliberate recklessness, and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of Viatris common stock, which were intended to, and did:

      a.  deceive the investing public, including Plaintiff and the Class, regarding, among other things, Viatris's business model and strategy, its commitment to biosimilars as the Company's key growth driver, and its growth strategy, outlook, and potential;

      b.  artificially inflate and maintain the market price of Viatris common stock; and

      c.  cause Plaintiff and other members of the Class to purchase Viatris common stock at artificially inflated prices and suffer losses when the true facts became known.

244.  Defendants are liable for all materially false or misleading statements made during the Class Period, as alleged above.

245.  As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with deliberate recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Viatris stock, were either known to Defendants or were so obvious that Defendants should have been aware of them.

246.  Plaintiff and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Viatris common stock, which inflation was removed from its price when the true facts became known. Plaintiff and the Class would not have purchased Viatris common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' materially misleading statements.

247.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Viatris common stock during the Class Period.

### Count II: Violation of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

248.  Plaintiff repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

249.  This count is asserted on behalf of all members of the Class against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

250.  The Individual Defendants acted as controlling persons of Viatris within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

251. By reasons of their high-level positions of control and authority as the Company's most senior officers, the Individual Defendants had the authority to influence and control, and did influence and control, the decision-making and the activities of the Company and its employees, and to cause

the Company to engage in the wrongful conduct complained of herein. The Individual Defendants were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Viatris during the Class Period, thereby causing the dissemination of the materially false or misleading statements and omissions of material facts as alleged herein. The Individual Defendants were provided with, or had unlimited access to, copies of the Company's press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

252.  Each of the Individual Defendants spoke to investors on behalf of the Company during the Class Period. Therefore, each of the Individual Defendants was able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Viatris during the Class Period, thereby causing the dissemination of the materially false or misleading statements and omissions of material facts as alleged herein.

253.  As set forth above, Viatris violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

254.  By virtue of their positions as controlling persons of Viatris and as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule l0b-5 promulgated thereunder, to Plaintiff and the other members of the Class who purchased or otherwise acquired Viatris securities. As detailed above, during their respective tenures, these Officer Defendants served as officers and directors of Viatris.

255.  As a direct and proximate result of the conduct by the Individual Defendants, Plaintiff and the other members of the Class suffered damages in connection with their purchases or acquisitions of Viatris common stock.

## PRAYER FOR RELIEF

256. Plaintiff prays for relief and judgment as follows:

a.    declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the class defined herein;

b.    awarding all damages and other remedies available under the Exchange Act in favor of Plaintiff and all members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c.    awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d.    such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury.

Dated: October 23, 2023

Respectfully Submitted,

*/s/ Colin Callahan*

FLANNERY | GEORGALIS LLC
Colin Callahan (P.A. I.D. # 328033)
707 Grant Street, Suite 2750
Pittsburgh, PA 15219
Tel: (412) 254-8602
ccallahan@flannerygeorgalis.com

*Liaison Counsel for Lead Plaintiff Eastern Atlantic States
Carpenters Pension, Annuity and Health Funds*

COHEN MILSTEIN SELLERS & TOLL PLLC
Steven J. Toll (*pro hac vice*)
Jan E. Messerschmidt (*pro hac vice*)
1100 New York Avenue NW, Suite 500
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
stoll@cohenmilstein.com
jmesserschmidt@cohenmilstein.com

Christina D. Saler (*pro hac vice*)
100 N. 18th Street, Suite 1820
Philadelphia, PA 19103
Tel: (267) 479-5700
Fax: (267) 479-5701
csaler@cohenmilstein.com

*Counsel to Lead Plaintiff Eastern Atlantic States Carpen-
ters Pension, Annuity and Health Funds and Lead Counsel
for the Class*